STATE of Iowa, Appellant,

v.

Randy G. CULLEN, Appellee.

No. 83–1163.

Supreme Court of Iowa.

Oct. 17, 1984.

Thomas J. Miller, Atty. Gen., Joseph P. Weeg, Asst. Atty. Gen., and David E. Richter, County Atty., for appellant.

Charles L. Harrington, Appellate Defender, and Linda Del Gallo, Asst. Appellate Defender, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and HARRIS, McCORMICK, SCHULTZ, and CARTER, JJ.

REYNOLDSON, Chief Justice.

After a jury found defendant Randy G. Cullen guilty of first-degree murder, trial court sustained defendant's mistrial motion, grounded on jury misconduct. We granted the State's application for discretionary review. We now reverse and remand for reconsideration by trial court in light of the correct rule to be applied when a party seeks to impeach a jury verdict.

In the early morning hours of April 8, 1983, several fights broke out in front of the Nashville Club, a Council Bluffs tavern. A number of people were involved in the fights, among them defendant and his alleged victim, Terry Doffin.

Trial testimony disclosed defendant arrived at the Nashville Club at about 11:30 p.m. on April 7, 1983. He sat at the bar next to a friend. A fight broke out in front of the club between some women. The decedent, Terry Doffin, and his brother became involved in the fight in an effort to break it up. Defendant, hearing of the fight, went outside. There was some evidence that defendant, a former amateur boxer, previously had served as a bouncer at the club. Once outside, defendant saw the Doffin brothers engaged in a scuffle with some women. Defendant grabbed one man, then the other, was hit on the head and finally fell to the ground, wrestling with Terry Doffin. In the course of this fight, Doffin bit defendant's finger, causing a severe cut.

From this point, trial testimony is wholly inconsistent. Defendant testified he returned to the bar to treat his bloody finger, and remained there for ten or fifteen minutes. He asserted his second confrontation with Terry Doffin came when he was called outside to break up a fight between Doffin and an unidentified man. While attempting to break up this fight, defendant scuffled with Doffin again. Defendant admitted striking Doffin in the face and kicking him in the legs. Doffin's fatal injury occurred, defendant testified, when Doffin slipped and fell, striking his head on a car bumper.

Other witnesses testified that defendant, angered that Doffin had bitten off "a piece of his finger," pulled the much smaller and bleeding Doffin from a car, and, while screaming "I am going to kill you," punched and kicked Doffin into unconsciousness. Doffin later was taken to a hospital where, on April 19, 1983, he died of brain damage.

At trial a factual dispute arose whether defendant had engaged Doffin in a one-on-one confrontation during the initial fight in front of the bar. On cross-examination, defendant denied he had. The State, however, presented three rebuttal witnesses who testified defendant had engaged Doffin individually during the "first" fight. Because these witnesses were not discovered by the State until shortly before their court appearance, the defense was not informed of their identity prior to trial. Consequently, defendant objected to this evidence prior to the time the witnesses testified as "improper rebuttal," raised the possibility that the witnesses might be related to the jurors, and contended the rebuttal witnesses "could have a prejudicial effect on the jurors."

After the rebuttal witnesses had testified, defendant moved, in chambers, for a mistrial on the ground that some of the jurors resided in the same area as the rebuttal witnesses. Defendant again pointed out the possibility the jurors knew, or were related to, the witnesses. The court overruled the motion.

The court then went into the jury room to dismiss the jury for the day. At that point, three women jurors informed the court, in the presence of the other jurors, that they knew one of the rebuttal witnesses. The court admonished the jury not to discuss the matter and immediately informed counsel of the situation.

The next morning defendant renewed his motion for a mistrial, again citing prejudice as a ground. The trial court again overruled the motion. The jury was instructed and later returned a verdict of guilty of murder in the first degree.

July 25, 1983, defendant made post-trial motions for mistrial and a new trial, alleging several grounds, including jury misconduct. In support of those motions, defendant offered affidavits by jurors Smith, Rallis and Verpoorten, and the professional statement of his attorney.[1] The Smith and Rallis affidavits were sworn and signed, in conformity with section 622.85 of the Code; the Verpoorten affidavit was not. Verpoorten was one of the three jurors who originally informed the court she knew one of the rebuttal witnesses. At the August 25 hearing on the motions, the State lodged numerous objections to the competence of the affidavits. It specifically waived any objection, however, that the Verpoorten affidavit was unsworn and unsigned.

August 31, trial court entered its order granting defendant's motion for a mistrial. The court observed this action made "defendant's Motion for New Trial ... moot.' The court specifically found "the more significant statements made by the jurors were that the jurors 'were terribly shocked and said they absolutely would not have served had they known these witnesses would be called to testify' and 'I believe this statement possibly had an effect on the jury's verdict' and 'These statements

---

1. *The Rallis affidavit* provided as follows:

My name is Jacqueline Rallis and I was a juror in the case of *State of Iowa v. Randy Cullen*. During the course of the trial the State called rebuttal witnesses that some of the jurors knew. When we went back to the jury room the women who knew the witnesses were terribly shocked and said they absolutely would not have served had they known those witnesses would be called to testify. I believe these jurors felt that they had been put in a position of having to choose whether to believe the Defendant or people they knew.

During the jury's deliberation one of the women said she knew that one of the rebuttal witnesses was a good boy from a good family, and wouldn't lie on the witness stand. I believe this statement probably had an effect on the jury's verdict.

*The Smith affidavit* provided as follows:

My name is Larry Smith and I was a juror in the case of State of Iowa v. Randy Cullen. It is my opinion that the rebuttal witnesses were a critical part of the State's case against Randy Cullen. On Thursday when Judge Sulhoff came into the jury room to tell us he was going to excuse us for the day, a couple of the women jurors from the Neola area mentioned to the Judge that they knew some of the rebuttal witnesses. The Judge said "okay, I will look into it and we will go from here."

During the jury's deliberations, one of the women from Neola made a reference to one of the rebuttal witnesses that she knew and said "he's a good kid from a good family. I know he wouldn't lie on the witness stand." These statements made it easier to believe the rebuttal witnesses.

*The Verpoorten affidavit* provided as follows:

My name is Joann Verpoorten and I was a juror in the case of State of Iowa v. Randy Cullen. During the course of the trial, another juror and myself told Judge Paul Sulhoff that we knew some of the rebuttal witnesses. In my case I told the Judge that I knew Jeff Cook because my son went to school with Jeff Cook's brother. It was quite a surprise to us when these rebuttal witnesses took the stand. For that reason we told Judge Sulhoff we knew them and he told us he would check into it and get back to us.

I know that Jeff Cook is a good boy and have known him for several years. I believe that the rebuttal witnesses made the jury's decision a lot easier.

*The professional statement* of Cullen's attorney stated, inter alia, that Ms. Verpoorten had, on the advice of an attorney, declined to sign her affidavit.

made it easier to believe the rebuttal witnesses.' " In granting the mistrial, trial court relied heavily on our language in *State v. Carey,* 165 N.W.2d 27, 30 (Iowa 1969), that "[i]n order that the institution of jury trials be preserved and its usefulness continued, its deliberations and pronouncements must be kept pure, and untainted, not only from all improper influences, *but from the appearance thereof."* (Emphasis in original.)

The State filed application for discretionary review pursuant to Iowa Code section 814.5 on September 13, 1983. We granted the application ten days later.

I. At the threshold a question arises whether a motion for a mistrial is permissible after the jury has returned its verdict. Authorities generally agree that a new trial contemplates a case has been tried and a verdict or judgment rendered, and by motion set aside. A mistrial contemplates some error that prevents the jury .from returning a verdict or the court from entering judgment. 66 C.J.S. *New Trial* § 1 (1950); *In re Estate of Bartholomae,* 261 Cal.App.2d 839, 842, 68 Cal.Rptr. 332, 334 (1968); *People v. Jamerson,* 196 Colo. 63, 65, 580 P.2d 805, 806–07 (1978); *Vilander v. Hawkinson,* 183 Kan. 214, 218, 326 P.2d 273, 276 (1958); *State v. Robbins,* 455 S.W.2d 24, 26 (Mo.App.1970). In *State v. Glenn,* 234 N.W.2d 396, 403 (Iowa 1975), we wrote that "relief after return of a guilty verdict in a criminal prosecution is, in this state, statutorily limited to arrest of judgment or a new trial." The statutes referred to in *Glenn,* however, have since been repealed, and replaced by Iowa Rule of Criminal Procedure 23. That rule appears less restrictive. It provides, "Permissible motions after trial *include* motions for new trial, motions in arrest of judgment, and motions to correct a sentence." (Emphasis added.) The question whether a motion for a mistrial is available after a jury has returned its verdict thus is

not settled in this state, but is not one we need to resolve here.

■ The defendant relied on jury misconduct as a common ground in both his motion for a new trial and mistrial. We look to the substance of a motion to determine its character. *First National Bank v. Claiser,* 308 N.W.2d 1, 2 (Iowa 1981). *See also Brigham v. Hudson Motors,* 118 N.H. 590, 593, 392 A.2d 130, 133 (1978). Without deciding whether defendant's mistrial motion was proper following the jury's verdict, we treat it as though it had been denominated a motion for a new trial.

■ II. Few principles of law are as well settled as our rules regarding post-trial motions predicated on jury misconduct. In recent years, we have confronted this issue several times. *See State v. Harrington,* 349 N.W.2d 758, 762–63 (Iowa 1984); *State v. Christianson,* 337 N.W.2d 502, 504–06 (Iowa 1983); *Crowley v. Glessner,* 328 N.W.2d 513, 514 (Iowa 1983); *State v. Folck,* 325 N.W.2d 368, 371–73 (Iowa 1982); *State v. Rouse,* 290 N.W.2d 911, 915–17 (Iowa 1980); *Harris v. Deere & Co.,* 263 N.W.2d 727, 729–34 (Iowa 1978). These opinions establish that, to impeach a verdict on the basis of jury misconduct, three conditions must be met: (1) evidence from the jurors must consist only of objective facts as to what actually occurred in or out of the jury room bearing on misconduct; (2) the acts or statements complained of must exceed tolerable bounds of jury deliberation; and (3) it must appear the misconduct was calculated to, and with reasonable probability did, influence the verdict. *See, e.g., Folck,* 325 N.W.2d at 372; *Harris,* 263 N.W.2d at 729–30.[2] Trial court has a broad discretion in ruling on these matters. "We do ·not find an abuse of discretion ... unless the action of the trial court is clearly unreasonable under the attendant circumstances." *Harrington,* 349 N.W.2d at 761.

For the sake of clarity, we will discuss each of these three requirements in reverse order.

2. The rules developed by our cases regarding impeachment of a verdict on the basis of jury misconduct are substantially the same as Iowa

Rule of Evidence 606(b). *See State v. Christianson,* 337 N.W.2d 502, 504 n. 1 (Iowa 1983).

■ III. In granting Cullen's motion for a mistrial, trial court stated:

> The ultimate issue involved herein is whether or not the external matters, to-wit: The *possibility* that the jurors were unable to give the testimony of these rebuttal witnesses the same weight as any other witnesses, influenced their verdict. The Court concludes that the answer to this inquiry does not depend on to what extent but merely to the *possibility* that it did. The Court concludes that it must answer this inquiry in the affirmative.

(Emphasis added.)

This was an incorrect statement of law because it impermissibly lowered the threshold at which a verdict must be set aside. As we noted above, our cases hold a new trial is justified only when it appears the misconduct was calculated to, and with *reasonable probability* did, influence the verdict. *Harris*, 263 N.W.2d at 730. The difference between a possibility and a reasonable probability is significant. Our decisions demonstrate the reasonable probability requirement is not easy to satisfy. *See Harrington*, 349 N.W.2d at 762–63 (Jurors' affidavits attesting to discussion among themselves that defendant had on a previous occasion shot his brother, a fact not in evidence by reason of a limine motion, and this discussion had some effect on jurors' vote, held, not proof of misconduct which was calculated to, or with reasonable probability did, influence the verdict.); *Christianson*, 337 N.W.2d at 505–06 (Juror's telephone call during deliberations, by which he obtained information impeaching a witness, fell short of showing any reasonable probability that the jury's verdict was affected.); *Folck*, 325 N.W.2d at 372–73 (Though jurors' affidavits disclosed that manifestly improper alleged facts not in evidence were injected into the jury discussions, the objectionable matter could not have influenced the verdict.).

It is apparent trial court relied on *Carey*, 165 N.W.2d at 27. In *Carey*, defendant's attorney moved for a mistrial when he saw a sign in the jury room stating "Coffee will be furnished in the jury room by the county clerk and the county attorney." *Id.* at 28. The trial court overruled the motion on the ground it was improbable that prejudice had resulted. *Id.* at 29. We reversed, stating that while it was unlikely that jurors could be corrupted for the price of a cup of coffee, "the jury is to be above suspicion and ... any practice which brings its proceedings under suspicion is to be prohibited." *Id.*

As precedent under the facts of this case, *Carey* is inapposite. In *Carey* we were concerned with manipulation of the jury by outsiders; here, we are concerned only with the internal operation of the jury. We believe the former case justifies a stricter rule, designed to keep the jury above suspicion. We conclude, however, trial court read more into *Carey* than we intended. We reversed in *Carey* not solely upon the suggestion of manipulation arising from the coffee sign, but upon the cumulative effect of all assigned errors. *Id.* at 36 ("We find some merit in each of defendant's assigned errors. Perhaps none alone is sufficient to require a new trial ....").

Trial court's application of an impermissibly restrictive standard requires reversal of its order granting defendant's mistrial motion. We remand to permit application of the court's discretion in light of the proper rule of law. On remand, questions inevitably will arise concerning the remaining two prongs of the rule governing the nullification of jury verdicts. The analysis that follows is intended to assist the trial court.

■ IV. Focusing on the second of the three requirements for impeaching a jury verdict, our decisions establish that jurors have "considerable latitude in their deliberations, and conduct or occurrences which are within tolerable limits are said to 'inhere in the verdict' or constitute no ground for 'impeachment of the verdict.' " *Harris*, 263 N.W.2d at 730. The factual content of our recent opinions gives life to this legal principle. In *State v. Houston*, 209

N.W.2d 42, 44 (Iowa 1973), jurors several times during deliberations turned off the lights in the jury room to test nighttime visibility. This was done in an effort to check the accuracy of a witness's testimony. *Id.* Defendant's motion for a new trial was overruled, and we affirmed. *Id.* We wrote, "Historically, we have considered such situations with a bemused but limited tolerance for the ingenuity of jurors and the realization a rigid approach would result in interminable litigation." *Id.* at 45. In *State v. Lass*, 228 N.W.2d 758, 771 (Iowa 1975), several jurors related their personal observations of individuals suffering hypoglycemic and diabetic attacks. We affirmed trial court's denial of motion for a new trial and repeated our admonition that "[A]s a practical matter, courts cannot be too strict on jury discussions or few verdicts could stand." *Id.*

 Turning to the last requirement for impeaching a jury verdict, our cases are clear that statements by jurors, subsequent to deliberations, as to whether they were influenced by certain matters or to what degree they were influenced, are incompetent for the purpose of impeaching a verdict and must be ignored. *See, e.g., Harrington,* 349 N.W.2d at 762 ("A juror may not by affidavit, testimony or otherwise state what influenced the jury in reaching its decision or verdict, as such showing inheres in the verdict."); *Houston,* 209 N.W.2d at 45 ("To justify a new trial for jury misconduct it must appear (*independently of what jurors might later say*) the misconduct was calculated to, and probably did, influence the verdict.") (emphasis added).

On remand, without suggesting what the ruling should be, trial court should reconsider defendant's motion, applying each of the above three conditions that must be met in order to nullify a jury verdict to reach a ruling consistent with our prior decisions.

REVERSED AND REMANDED.