# IN THE COURT OF APPEALS OF IOWA

No. 17-0085
Filed April 18, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**LEE SAMUEL CHRISTENSEN,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Emmet County, David A. Lester,

Judge.


        Lee Samuel Christensen appeals his conviction for second-degree murder

following a jury trial. **REVERSED AND REMANDED.**


        Leon F. Spies of Spies, Pavelich & Foley, Iowa City, for appellant.

        Thomas J. Miller, Attorney General, and Kelli A. Huser, Assistant Attorney

General, for appellee.


        Heard by Danilson, C.J., and Vaitheswaran, Doyle, Tabor, and McDonald,

JJ.  Vogel, J., takes no part.

**PER CURIAM.**

Lee Samuel Christensen shot a young man who was seeing a woman he once dated. The State charged Christensen with first-degree murder. The defense conceded Christensen was the shooter but argued he acted out of passion, warranting a verdict of voluntary manslaughter, the second of three lesser-included offenses. A jury found him guilty of second-degree murder, the first of the three lesser-included offenses.

On appeal, Christensen raises several issues. We find dispositive his claim of juror misconduct based on the introduction of extraneous information into jury deliberations.

## I.     *Juror Misconduct*

*Background Proceedings*. The proceedings leading up to the claim of juror misconduct are as follows. During the six-day trial, the district court repeatedly admonished the jurors "not to converse among" themselves "or with anyone else on any subject connected with this case." They were also instructed not to "allow anyone to speak with" them "about this case." If someone did, they were to "walk away and . . . not listen." If a person persisted in talking to them or in their presence, the court instructed the jurors to "report it immediately" to the clerk or to the court. The jurors' phones were taken away during deliberations. The jurors were "admonished not to listen to, view, or read any form of media while this case is in progress." They were told, "This includes . . . the full gamut of social media, the internet, cell phone communications, Instagram, Twitter." They were instructed not to "report to anybody on Facebook or any of those [social media] that" they had

"been selected as a juror" to avoid inadvertently receiving something they were "not supposed to have." Finally, the court stated, "Our goal here is to have this case decided strictly upon the evidence and testimony presented at trial. So we do not want you to see any outside information that's not presented here."

At the conclusion of trial, the district court reminded the jurors, "You may not communicate about this case before reaching your verdict. This includes cell phones, and electronic media such as text messages, Facebook, MySpace, LinkedIn, YouTube, Twitter, email, etc."

Several jurors disregarded these admonitions. After the jury announced its verdict, Christensen moved for a new trial. He asserted:

> During deliberations, the jury was exposed to and influenced by extraneous social media information which was considered by the jurors during the deliberative process. This act exceeded the tolerable bounds of jury deliberation and appeared calculated to, and with reasonable probability did, influence the jury's verdict.

Christensen claimed his "rights under the constitutions of the United States and the State of Iowa to a fair trial and due process of law were violated for all the reasons urged above." Christensen simultaneously moved to poll the jury. The district court granted the motion to poll.

Following a hearing, the court denied the new trial motion. The court began by conceding the jury received unauthorized information:

> The testimony from the majority of jurors during the post-trial hearing confirms they were made aware of extraneous information concerning the possibility of a riot or some other sort of public disturbance or violence occurring if the jury did not find Christensen guilty of something.

Turning to whether the information was prejudicial, the court stated, "[S]uch information, if actually considered by the jury during their deliberations, would certainly be prejudicial." But, in the court's view,

> While there [was] some testimony suggesting that the extraneous information about the possibility of a public disturbance, a riot, or public violence was brought to light prior to them reaching their verdict, the greater preponderance of the evidence establishes that it was not until after the jury had reached their verdict that such evidence was discussed.

The court concluded, "[T]he jury could not have exceeded the tolerable bounds of their deliberations."

On appeal, Christensen argues, "There can be no doubt that the exposure of one or more jurors to Facebook postings or conversations with family members about the possibility of a riot or danger to the jurors in the event Christensen was not found guilty of murder constitutes misconduct." He asserts the misconduct "was calculated to, and with reasonable probability did, influence the verdict."

*Standard of Review.* In *State v. Webster*, 865 N.W.2d 223 (Iowa 2015), the defendant filed a new trial motion raising a rule-based claim as well as a constitutionally-grounded claim of juror misconduct and bias. The district court denied the motion. *Webster*, 865 N.W.2d at 230. On appeal, the court acknowledged constitutional claims trigger de novo review, but concluded the defendant waived the constitutional claim and review was for an abuse of discretion. *Id.* at 231 n.4, 232. Given the posture of the case and the court's "general[] agree[ment] with the fact-finding of the district court," the court declined to decide "the proper standard of review regarding fact-finding by the district court in the context of a motion for a new trial." *Id.* at 231 n.4.

We are faced with the same procedural posture. The district court denied the misconduct/bias ground for a new trial under Iowa Rule of Criminal Procedure 2.24(2)(b)(2) (2015). The court also cited rule 2.24(2)(b)(9), permitting a court to grant a new trial if the defendant has not received a fair and impartial trial, but did not address the constitutional claim of juror misconduct. Accordingly, our review of the district court's ultimate conclusion on Christensen's new trial motion is for an abuse of discretion.

That said, we are faced with the question the *Webster* court was able to avoid—the standard of review of district court fact-findings—because, unlike the court in *Webster*, we disagree with the district court's key fact-findings supporting the ruling. The rule-based claim of juror misconduct is grounded in the constitution and, specifically, a defendant's right to a fair trial. *See* Iowa Rs. Crim. P. 2.24(2)(b)(9); 2.24(2)(b)(3) (authorizing a new trial where "the jury . . . ha[s] been guilty of any misconduct tending to prevent a fair and just consideration of the case"); *State v. Weitzel*, 905 N.W.2d 397, 403 (Iowa 2017) (declining to "strictly demarcate a clear line between rule-based and due-process claims"). Although Christensen waived his constitutional claim, we believe the constitutional undergirding of the rule and the district court's reliance on the rule requiring a fair and impartial trial mandate de novo review of the fact findings. We proceed to the merits.

*Rule 2.24(2)(b).* Rule 2.24(2)(b)(2) permits a new trial if "the jury has received any evidence . . . not authorized by the court." Iowa R. Crim. P. 2.24(2)(b)(2). Receipt of this type of evidence constitutes

misconduct. *See Webster*, 865 N.W.2d at 235 ("There can be no question that communications with third parties about the merits of a case outside the confines of jury deliberations is a species of misconduct."); *id.* at 232 ("Juror misconduct ordinarily relates to actions of a juror, often contrary to the court's instructions or admonitions, which impair the integrity of the fact finding process at trial."); *State v. Johnson*, 445 N.W.2d 337, 342 (Iowa 1989) ("[I]ntroduction of additional, outside information is beyond permissible bounds."), *overruled on other grounds by State v. Hill*, 878 N.W.2d 269 (Iowa 2016); *see also* Iowa R. Evid. 5.606(b) (allowing a juror to testify about whether "[e]xtraneous prejudicial information was improperly brought to the jury's attention"). But "[w]e have consistently held misconduct with respect to the jury . . . will not be grounds for a new trial unless prejudice is shown." *State v. Carey*, 165 N.W.2d 27, 29 (Iowa 1969). We turn to the record on juror misconduct.

*Pre-Deliberaton Facebook Contact.* Before deliberations began, a juror reported she logged onto Facebook during a lunchbreak and noticed Christensen's relative was listed on her profile as one of several top friends. She advised the court she met the relative on a "girls' weekend trip" three years earlier and they became Facebook friends. She denied routine contact with the relative and denied having any conversation with her about the case. She stated the contact would not prevent her from being a fair and impartial juror in the case. The district court decided to keep the juror on the jury.

The juror did not receive extraneous information. But the contact highlighted jurors' blatant disregard of the district court's unambiguous admonition

to refrain from the use of social media during the trial. *See Webster*, 865 N.W.2d at 239 (disapproving of a juror's click of the "like" button on a comment by the victim's stepmother).

*Post-Deliberation Extraneous Information.* Several jurors reported gaining access to extraneous information after they began deliberating. This information is the crux of the misconduct claim.

One juror was asked,

[B]efore you and the other jurors reached your verdict and announced it in the courtroom, did you hear or see any comments from news media, from social media, from comments in the community, among friends, people that you know that there might be some sort of public disturbance or riot or public violence if a certain verdict wasn't reached in Mr. Christensen's case?

The juror responded, "I didn't see it, but I did hear in the jury room that some people had seen it on Facebook." He described the people as "two female jurors." When asked if "the other jurors" said "specifically what they heard or saw," he said, "I think what specifically came up is that there were some threats against the jury depending on what—whatever decision was made." The women "just said that there are people threatening the jury." Although this juror could not say the threats were "dependent on what specific decision was made by the jury," he stated the threats "had an impact on . . . the jury feeling safe" and "upon reaching a verdict, there was a decision made to ask for a police presence as we walked to our cars to make sure we were safe." While, in his view, the discussion "wasn't part of our proceedings at all . . . as far as the decision we reached," he admitted the discussion took place "prior to" the announcement of the decision in open court.

A second juror, asked the same question by defense counsel, began by stating she did not learn of extraneous comments about a riot or public disturbance or violence if a certain verdict was not reached until "after the decision was made" and they "were escorted out." However, on further questioning, she said the information was mentioned "a few days" before the jurors came into the courtroom to announce their verdict, "[d]uring the time [they] were in the jury room." She agreed the information referenced in the question "was mentioned to all of us" and the person who mentioned it "had been told that it was all over Facebook."

A third juror stated, "I did hear someone say something about that, but I don't know who." She did not recall the time line. Later, she explained, "I think someone just said that they heard that if we didn't vote for first degree murder that there was going to be—people were going to be mad or be outside the courthouse, something to that effect."

A fourth juror seconded the third juror's comments. When asked what she recalled being brought up in the jury room, she said, "Just that someone had told them that if it wasn't first degree that there would be a riot." She stated the comment was made after the jury reached a verdict but before it was announced in the courtroom.

A fifth juror said a person was told there was something on Facebook, but she heard the comment after the verdict was announced and after they returned to the jury room, but before they left the courthouse.

A sixth juror said there was a concern for the safety of jurors, but he did not remember "if it was after the verdict or before." He said "most people raised their

hands" when asked if they were worried about their safety. He attributed the concern to the "highly charged," "emotional pressure" in the jury room.

A seventh juror agreed she heard other jurors in the jury room say they heard or saw something about possible violence based on what the verdict might be. She said, "There was just a comment made that there might be, like a possible riot at the courthouse." She said the comment was made before they came in to announce the verdict. She stated one juror made the comment and it was based on a call she received.

An eighth juror described a "very emotional" juror who heard there would possibly be a riot. The juror said the comment was made after the verdict was announced in open court.

In sum, eight of the twelve jurors said they received extraneous information relating to the outcome of the case in the jury room, after they began deliberating.

A ninth juror said she heard "there had been talk about a riot if [Christensen] wasn't found guilty." She said she heard it out in the public somewhere while the trial was still going on but did not recall that it was discussed in the jury room. The juror appeared to have heard the information outside the jury room. In *Webster,* the court found a juror "confronted with brief conclusory statements by third parties," who "did not engage in an extended conversation on the merits of the case," did not commit misconduct. 865 N.W.2d at 235. Accordingly, we do not count her in the final tally of jurors who received extraneous information during jury deliberations. However, we do count her in the tally of jurors who received extraneous information.

The information received by the jurors came from sources explicitly prohibited by the court's admonition. No juror reported these violations to the clerk or to the judge.[1] We conclude the eight jurors' receipt of extraneous information during deliberations amounted to juror misconduct. *See Webster*, 865 N.W.2d at 235. The jurors violated rule 2.24(2)(b)(2). The district court did not abuse its discretion in reaching the same conclusion.[2]

*Prejudice.* The general prejudice standard in the juror misconduct context has been framed as follows: "[I]t must appear the misconduct was calculated to, and with reasonable probability did, influence the verdict." *Cullen*, 357 N.W.2d at 27, *partially abrogated by Ryan*, 422 N.W.2d at 495; *see also Webster*, 865 N.W.2d at 235-36 (applying the *Cullen* prejudice standard). However, in *Cullen*, the court also discussed another prejudice standard. *See Cullen*, 357 N.W.2d at 28. After distinguishing between the internal operations of the jury and "manipulation of the jury by outsiders," the court stated, the manipulation scenario "justif[ied] a stricter

---

[1] One juror thought the court was informed. The district court confirmed no one conveyed this post-deliberation information to the court.

[2] In finding a violation of rule 2.24(2)(b)(2), the district court relied on *State v. Cullen*, 357 N.W.2d 24, 27 (Iowa 1984). There, the Iowa Supreme Court articulated a three-part test for analyzing juror misconduct:

> (1) evidence from the jurors must consist only of objective facts as to what actually occurred in or out of the jury room bearing on misconduct; (2) the acts or statements complained of must exceed tolerable bounds of jury deliberation; and (3) it must appear the misconduct was calculated to, and with reasonable probability did, influence the verdict.

*Cullen*, 357 N.W.2d at 27. The court later clarified the first prong of the test. *See Ryan v. Arneson*, 422 N.W.2d 491, 495 (Iowa 1988). Applying this test, the district court found a violation of the rule but stated the violation did not exceed the tolerable bounds of jury deliberations. In effect, the court equated the second prong of the *Cullen* test with the third, prejudice prong. In our view, the second prong—whether the jury exceeded the tolerable bounds of jury deliberation—goes to the question of whether there was misconduct. *See Johnson*, 445 N.W.2d at 342.

rule, designed to keep the jury above suspicion." *Id.*; *see also State v. Wells*, 437 N.W.2d 575, 581 (Iowa 1989) ("[W]e do not have a question of influence exerted by nonjury members which would call for the application of the stricter rule.")

In *Carey*, 165 N.W.2d at 29, the court characterized the stricter rule as "equally well-established." The court stated, "[T]he jury is to be above suspicion and that any practice which brings its proceedings under suspicion is to be prohibited." *Carey*, 165 N.W.2d at 29. There, the outside influence was a sign placed by the bailiff outside the jury room stating, "Coffee will be furnished in the jury room by the county clerk and the county attorney." *Id.* at 28. The Iowa Supreme Court began by acknowledging the absence of a contention that "any juror here was corrupted for the price of a cup of coffee." *Id.* at 29. But the court stated, "[W]e along with all courts have zealously guarded the utter independence of jurors." *Id.*; *see also Omaha Bank for Coops. v. Siouxland Cattle Coop.*, 305 N.W.2d 458, 461-63 (Iowa 1981) (concluding claim needed to be "retried to 'zealously (guard) the utter independence of jurors,'" where a jury foreman bought drinks for lawyers representing a party). The court continued, "[O]ur concern is with the implication that attaches to the administration of justice under these circumstances." *Carey*, 165 N.W.2d at 30 (quoting *Daniels v. Bloomquist*, 138 N.W.2d 868, 872 (Iowa 1965)). The court stressed the importance of public confidence in our jury system, stating:

> In order that the institution of jury trials be preserved and its usefulness continued, its deliberations and pronouncements must be kept pure, and untainted, not only from all improper influences, But from the appearance thereof. It is often said that the jury is one of the bulwarks of our liberty, but it will remain so only as long as public confidence in the institution prevails.

*Id.* (quoting *Daniels*, 138 N.W.2d at 872). This was particularly true "in a criminal trial." *Id.* The court held the outside influence justified a new trial because "all attempts to ingratiate one side or the other with the jury must be prevented." *Id.*

We have no trouble concluding Christensen would be entitled to a new trial under *Carey's* stricter rule. The threat of a public disturbance if jurors did not find Christensen guilty[3] was known by jurors at or before the time the verdict became final. Most of the jurors were so concerned about their safety that they asked for additional security. The integrity of their deliberative process was impugned.

That said, our courts have not always applied the stricter rule to the introduction of external information designed to manipulate a jury. *See, e.g.*, *Webster*, 865 N.W.2d at 235-36 (applying *Cullen* standard to juror's conversation with a third-party); *State v. Anderson*, 448 N.W.2d 32, 34-35 (Iowa 1989) (citing *Carey* for the proposition that "conduct by an outsider, improperly influencing a juror, can be grounds for a new trial" but applying the *Cullen* prejudice test). Accordingly, we will not end our analysis with application of the *Carey* prejudice test but will also apply the *Cullen* prejudice test.

To determine whether the misconduct was calculated to and with reasonable probability did, influence the verdict, the district court is to judge "[t]he impact of the misconduct . . . objectively . . . in light of all allowable inferences brought to bear on the trial as a whole." *Doe v. Johnston*, 476 N.W.2d 28, 35 (Iowa 1991). The inquiry is "whether the extraneous information would prejudice a typical

---

[3] Depending on the recollection of the jurors, the threat required a finding of guilt on the charge of first-degree murder or of something else.

juror." *State v. Henning*, 545 N.W.2d 322, 325 (Iowa 1996). The "trial court in the exercise of its broad discretion properly could examine the claimed influence critically in light of all the trial evidence, the demeanor of witnesses and the issues presented before making a commonsense evaluation of the alleged impact of the jury misconduct." *State v. Christianson*, 337 N.W.2d 502, 506 (Iowa 1983).

We conclude the extraneous evidence of a riot or disturbance or threat was "calculated to" influence the jury. *See Wells*, 437 N.W.2d at 581 (stating juror's visit to the scene was calculated to influence the verdict). The first juror's statement "that there were some threats against the jury depending on what— whatever decision was made" and the third and fourth jurors' statements that they heard if they did not vote for first-degree murder people would be mad and there might be a riot, would have led a reasonable juror to believe outside forces were disseminating information designed to influence the verdict.

The more difficult question is whether the extraneous information with reasonable probability did influence the verdict. As noted, the district court concluded it "would certainly be prejudicial" if information "concerning the possibility of a riot or some other sort of public disturbance or violence occurring if the jury did not find Christensen guilty of something" was "actually considered by the jury during their deliberations." But the court declined to find prejudice because, in its view, "it was not until after the jury had reached their verdict that such evidence was discussed."

In fact, of the nine jurors who said they received extraneous information, at least four remembered receiving the information before the verdict was announced

in the courtroom. Because the extraneous information was "actually considered by" certain jurors "during their deliberations," the court's conditional finding of prejudice should have been unconditional. *See Johnston*, 476 N.W.2d at 35 ("[T]he trial court is in the best position to objectively assess the impact of juror misconduct."); *cf. Anderson*, 448 N.W.2d at 34-35 (affirming denial of new trial motion where juror was uninfluenced by the comments of the outsider and the other jurors were unaware of the comments until the verdict was reached); *Wells*, 437 N.W.2d at 580-81 (concluding juror only discussed visit to scene with one juror, who was dismissed and replaced with an alternate juror).

In any event, whether the extraneous information came in before the jurors agreed on a verdict or after the verdict was reached but before it was announced in open court makes little difference because, until a verdict is announced in open court, it is not final. *See* Iowa R. Crim. P. 2.22(5) ("The jury, agreeing on a verdict unanimously, shall bring the verdict into court, where it shall be read to them, and inquiry made if it is their verdict. . . . If any juror expresses disagreement on such poll or inquiry, the jury shall be sent out for further deliberation; otherwise, the verdict is complete and the jury shall be discharged."); *see also State v. Jones*, 817 N.W.2d 11, 18 (Iowa 2012) ("Even though jurors very rarely change their verdict when polled, the possibility that they may change their verdict requires a court to insist that the jury return its verdict in the presence of the defendant."); *id.* ("The requirement that verdicts be announced in open court vindicates the judicial system's symbolic interest in maintaining the appearance of justice and its pragmatic interest in giving the finder of fact a final opportunity to change its

decision." (citation omitted)). Because the verdict had to be unanimous and the jurors could have changed their minds in open court, we conclude the misconduct was calculated to and with reasonable probability did influence the verdict.

In reaching this conclusion, we have considered the State's argument that there was no prejudice because "the defense theory was that it was second-degree murder, not a premeditated murder" and the defense theory succeeded. To the contrary, the defense did not ask for a finding of guilt on the charge of second-degree murder. The defense pointed out the four options facing the jury—first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter—and asserted, "[A]t best the evidence establishes that [Christensen] committed the crime of voluntary manslaughter." Christensen's attorney specifically moved for judgment of acquittal on first- and second-degree murder. And in closing argument, he advocated for a finding of guilt on voluntary manslaughter. In short, the defense did not get what it asked for. *See State v. Ceretti*, 871 N.W.2d 88, 93-94 (Iowa 2015) (distinguishing mental states for first-degree murder, second-degree murder, and voluntary manslaughter and stating, "Because a person could commit voluntary manslaughter under circumstances which would otherwise be second-degree murder, specific intent to kill is not an essential element of voluntary manslaughter").

Nor are we persuaded by the State's contention that the strength of the State's case warrants a finding of no prejudice. The State cited Christensen's admission "to both of his parents and his ex-girlfriend that he harmed the victim," "[t]he gun and ammunition . . . discovered in [his] home," "[a] bloodstain on [his]

blue jeans and . . . on boots" at his home, a text from the victim to his ex-girlfriend "that he gave [Christensen] a ride home on the day of his murder," and "the evidence . . . that the victim was killed during a narrow window consistent with when he was with the defendant."

Christensen's attorney conceded most of these facts. He spent little time on whether Christensen shot the young man and whether the man died as a result—both elements of first-degree murder, second-degree murder, and voluntary manslaughter. Instead, he attacked the State's evidence on Christensen's mental state—whether he "acted willfully, deliberately, premeditatedly, and with a specific intent to kill" the young man, as required for a finding of guilt on first-degree murder, and whether he acted with malice aforethought, as required for a finding of guilt on first-degree and second-degree murder. And he elicited evidence supporting the mental state for voluntary manslaughter—"The shooting was done solely by reason of sudden, violent and irresistible passion resulting from serious provocation." He told the jury he would not insult their intelligence by seeking a verdict of "not guilty" and insisted the crime was one of passion. The State's essentially undisputed shooting evidence was not the sticking point; Christensen's mental state was. The extraneous information with reasonable probability could have influenced which mental state the jurors adopted and, hence, which verdict they reached, irrespective of the strength of the remaining evidence.

We are also unpersuaded by the State's reliance on juror testimony minimizing the effect of the extraneous information. As the court stated in *Cullen*,

"statements by jurors, subsequent to deliberations, as to whether they were influenced by certain matters or to what degree they were influenced, are incompetent for the purpose of impeaching a verdict and must be ignored." 357 N.W.2d at 29. "To justify a new trial for jury misconduct it must appear (independently of what jurors might later say) the misconduct was calculated to, and probably did, influence the verdict." *State v. Houston*, 209 N.W.2d 42, 45 (Iowa 1973). This standard was satisfied.

Notably, the Iowa Supreme Court adopted the "reasonable probability that the misconduct influenced the verdict" test to prevent de minimus extraneous information from upending jury verdicts. *See Johnston*, 476 N.W.2d at 35 ("Plaintiffs urge us to retreat from this standard and adopt, instead, a rule whereby prejudice is presumed to result from the introduction of extraneous material. We decline the invitation to do so. A certain amount of leeway must be built into the system so that a relatively minor incident of misconduct is not allowed to disrupt what may have been a lengthy, costly, and otherwise fair trial. We are still convinced that the trial court is in the best position to objectively assess the impact of juror misconduct."). The extraneous information in this case was far from de minimus. The information caused jurors to express concerns about their personal safety.

## II.    *Disposition*

We conclude the extraneous information introduced into the jury room was calculated to and with reasonable probability did influence the jury verdict. The denial of Christensen's new trial motion amounted to an abuse of discretion. We

reverse and remand for a new trial. In light of our disposition, we find it unnecessary to address the remaining issues raised by Christensen.

**REVERSED AND REMANDED.**

All judges concur except McDonald, J., who dissents.

**MCDONALD, Judge** (dissenting).

Is there any thing whereof it may be said, See, this is new?  No, there is no new thing under the sun.  Take this case for example.  While the defendant presents this case as raising new issues regarding juror exposure to social media, this case merely presents the intersection of two long-resolved issues in the administration of the criminal jury trial.  The first issue is whether the defendant's right to receive a fair trial was compromised by trying a high-profile case in a smaller community.  *See* 3 William Blackstone, *Commentaries*, \*349, \*383 ("A jury coming from the neighborhood is in some respects a great advantage; but is often liable to strong objections: especially in small jurisdictions . . .  or where the question in dispute has an extensive local tendency; where a cry has been raised and the passions of the multitude been inflamed.").  The second issue is whether the defendant's right to receive a fair trial was compromised by the injection of information into the trial process due to technological advances in the dissemination of information.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.").  The district court did not abuse its discretion or otherwise err in concluding the defendant did not establish an entitlement to new trial pursuant to the long-standing precedents governing the relevant issues.  I respectfully dissent.

"The right to a trial by an impartial jury lies at the very heart of due process." *Smith v. Phillips*, 455 U.S. 209, 224 (1982) (Marshall, J. dissenting). To protect the defendant's right to trial by a fair and impartial jury, we have in place an elaborate pretrial process to select and empanel a fair and impartial jury. The prospective jurors must be drawn from a fair cross-section of the community. *See Smith*, 455 U.S. at 226 (Marshall J., dissenting). The defendant may seek to change the venue of his trial upon proof "that such degree of prejudice exists in the county in which the trial is to be held that there is a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from the county." Iowa R. Crim. P. 2.11(10)(b); *see Smith*, 455 U.S at 227 (Marshall J., dissenting). The parties may challenge the jury panel for any material departure from the statutory requirements for drawing or returning the jury. *See* Iowa R. Crim. P. 2.18(3). The parties are entitled to conduct voir dire of the prospective jurors to determine whether they are qualified and able to serve as jurors. *See* Iowa R. Crim. P. 2.18(6); *Smith*, 455 U.S. at 226 (Marshall, J., dissenting). The parties are entitled to challenge and remove jurors for cause. *See* Iowa R. Crim. P. 2.18(5). The parties are entitled to peremptory strikes of other jurors. *See* Iowa R. Crim. P. 2.18(9).

The record reflects the parties successfully availed themselves of these pretrial procedures to select a fair and impartial jury. The district court and the lawyers were keenly aware selecting a jury would be more difficult in this case than in the average case due to the visibility of the case in the community. At the beginning of jury selection, the district court stated, "This case, as I understand it,

has gotten a fair amount of media attention. I'm from Estherville. I know this is a small community, people talk. So I just want to ask all of you at this point in time how many of you have heard about this case or have knowledge of this case, raise your right hand. That's a pretty good group. Please put them down." With this understanding, the district court and the lawyers conscientiously and diligently conducted voir dire of the prospective jurors over several days. A fair reading of the transcript shows the district court liberally granted the defendant's for-cause challenge to any prospective juror who expressed an inability or even reluctance to judge the case solely on the evidence presented at trial. A fair reading of the transcript also shows the jurors selected to serve, as a whole, were engaged in the process, candid in their responses to the lawyer's respective questions, and committed to rendering a verdict solely on the evidence and argument presented during trial.

Despite the pretrial procedures designed to select and empanel a fair and impartial jury, there are nonetheless circumstances that might later arise that might call into question whether the jury was in fact fair and impartial. One such circumstance is juror misconduct. "Juror misconduct ordinarily relates to actions of a juror, often contrary to the court's instructions or admonitions, which impair the integrity of the fact-finding process at trial. Typical acts of misconduct include communication with others outside the jury about the case, independently investigating the crime or accident scenes outside of judicial oversight, or engaging in independent research about questions of law or fact." *State v. Webster*, 865 N.W.2d 223, 232 (Iowa 2015). A related, perhaps overlapping, circumstance is

jury intrusion. Jury intrusion occurs when extraneous information makes it way to the jury. *See United States v. Olano*, 507 U.S. 725, 739 (1993). "Jury intrusions may range from petty, *de minimis* incidents to outrageous conduct." *United States v. Ramos*, 71 F.3d 1150, 1153 (5th Cir. 1995). This case seems more an instance of jury intrusion rather than jury misconduct. *See State v. Anderson*, 448 N.W.2d 32, 34 (Iowa 1989).

Whether the claim is classified as juror misconduct or jury intrusion, well-established case law provides the defendant must prove the misconduct or intrusion "affect[ed] the jury's deliberations and thereby its verdict." *Olano*, 507 U.S. at 739; *Webster*, 865 N.W.2d at 223. The federal standard was summarized in *Olano*:

> We generally have analyzed outside intrusions upon the jury for prejudicial impact. *See, e.g., Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1967) (*per curiam*) (bailiff's comments to jurors, such as "Oh that wicked fellow he is guilty," were prejudicial); *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) (pretrial publicity was not prejudicial); *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986) (presence of uniformed state troopers in courtroom was not prejudicial). A prime example is *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), where an outsider had communicated with a juror during a criminal trial, appearing to offer a bribe, and the Federal Bureau of Investigation then had investigated the incident. We noted that "[t]he sending of an F.B.I. agent in the midst of a trial to investigate a juror as to his conduct is bound to impress the juror," and remanded for the District Court to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.*, at 229-230, 74 S.Ct., at 451.
>
> . . . .
>
> There may be cases where an intrusion should be presumed prejudicial, *see, e.g., Patton*, *supra*, 467 U.S., at 1031-1035, 104 S.Ct., at 2888-2890; *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546,

13 L.Ed.2d 424 (1965), but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?

507 U.S. at 738–39. The Iowa standard is expressed differently but encompasses the same general notion: whether it appears "the misconduct was calculated to, and with a reasonable probability did, influence the verdict." *Webster*, 865 N.W.2d at 235–36 (quoting *State v. Cullen*, 357 N.W.2d 24, 27 (Iowa 1984)).

When this court evaluates the district court's ruling on a motion for new trial due to juror misconduct or juror intrusion, two significant principles guide our review. First, there is legal significance attached to the jury's verdict. Once the jury has been sworn and rendered a verdict, we presume the jurors faithfully discharged their civic duty in accord with the district court's admonitions and instructions in the absence of clear evidence to the contrary. *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process."); *United States v. Padilla*, 639 F.3d 892, 897 (9th Cir. 2011) (stating the jury "is entrusted with the obligation to apply the law and we in turn presume that juries follow instructions given to them throughout the course of the trial"); *State v. Ary*, No. 14-1112, 2015 WL 4935612, at *13 (Iowa Ct. App. Aug. 19, 2015) (McDonald, J., dissenting) ("I reject the premise that we presume the impaneled jurors were not impartial solely because of their exposure to one juror's stray remarks during voir dire. Instead, our caselaw provides we presume the

impaneled jurors were serious-minded in taking their oath, they followed the court's instruction to render a verdict on the evidence, and they discharged their civic duty with the seriousness and earnestness the occasion demanded."), *vacated by State v. Ary*, 877 N.W.2d 686 (Iowa 2016).  We honor the jury's service and attach weight to the finality of the jury's verdict.  *See Webster*, 865 N.W.2d at 233 ("Further, here, a jury verdict has been rendered after a lengthy trial, and we have no desire to start again for trifles.  As has been often said, the accused is not entitled to a perfect trial, but only a fair trial.").

Second, we defer to the judgment of the district court.  District courts have an institutional advantage over appellate courts in ruling on motions for new trial arising out of claims of jury misconduct or jury intrusion.  District courts regularly preside over trials and have better developed the skills necessary to evaluate the facts and circumstances of the particular case with respect to the conduct of the trial.  The district court judge is a member of the local community and has his finger on the pulse of the community of which the jury is merely a microcosm.  The district court also has the advantage of percipience.  "We, as an appellate tribunal, are in a poor position to evaluate these competing considerations; we have only an insentient record before us.  The trial court is in a far better position to judge the mood at trial and the predilections of the jury."  *United States v. Ramos*, 71 F.3d 1150, 1153 (5th Cir. 1995); *see also Olano*, 507 U.S. at 739; *Remmer v. United States*, 347 U.S. 227, 228 (1954).

For these two reasons, among others, our review is for an abuse of discretion.  *See Webster*, 865 N.W.2d at 231 ("We review a denial of a motion for

a new trial based upon juror misconduct or juror bias for an abuse of discretion."); *State v. Nitcher*, 720 N.W.2d 547, 559 (Iowa 2006) ("The district court has broad discretion in ruling on a motion for new trial, and thus our review in such cases is for abuse of discretion."); *Cullen*, 357 N.W.2d at 27 (noting the district court has broad discretion when determining misconduct and its ruling will only be deemed an abuse of discretion if it is clearly unreasonable.).

In applying these long-standing rules and principles, I cannot conclude the district court abused its discretion or otherwise erred in denying the defendant's motion for new trial. The defendant failed to prove the alleged intrusions were calculated to influence the jury's verdict. "Calculated" means to plan or contrive to accomplish a purpose. *See Calculated*, Merriam Webster Online, https://www.merriam-webster.com/dictionary/calculated (last visited Apr. 10, 2018). "Calculated" connotes agency, viz., there is an actor who targeted the jury for the purpose of influencing the jury's verdict. In this case, there is no record of any actor seeking to influence the jury's verdict. Instead, the only evidence here is a Facebook post from an unknown person. During the hearing on the defendant's motion for new trial, no juror identified any actor allegedly attempting to influence the jury's verdict. The majority opinion does not identify the actor "calculating" to influence this jury's verdict.

The defendant also failed to establish a reasonable probability the alleged intrusions did, in fact, influence the jury's verdict. *See Riessen v. Neville,* 425 N.W.2d 665, 669 (Iowa Ct. App. 1998) ("A new trial is justified only when it appears the misconduct was calculated to, and with reasonable probability did, influence

the verdict."). The difference between a possibility and a reasonable probability is significant. *See id.* The reasonable probability requirement is not easy to satisfy. *Id.* The intrusion is judged objectively "to determine whether the extraneous information would prejudice a typical juror. The standard has been expressed in terms of whether the material was of a type more likely than not to implant prejudice of an indelible nature upon the mind." *State v. Henning*, 545 N.W.2d 322, 325 (Iowa 1996) (citations omitted). "Prior decisions show that this prong is not easily satisfied." *State v. Bergmeier*, No. 00-1051, 2001 WL 1203377, at *3–4 (Iowa Ct. App. Oct. 12, 2001).

First, the content of the information is not of the type that would have influenced the jury's verdict. At issue in this case are vague allegations of possible disturbances in the community. In the record, there is a Facebook post from an unknown poster. The unknown poster stated "she was told" by unknown persons of unsubstantiated "rumors" of a "possible riot." Although the majority tries to characterize these statements as a direct threat against the jury to reach a particular verdict, there is no specific, readily identifiable, credible threat against the jury depending on its verdict. One juror stated the rumors were "ridiculous." Another juror testified the issue was raised and readily dismissed. When asked for detail about what was heard, one juror captured the zeitgeist. The juror stated the alleged disturbance was not "dependent on what specific decision was made by the jury, just that there were people on both sides of the issue about whatever the decision would be made." In other words, at worst, the Facebook post and other unsubstantiated rumors of possible disturbances in the community—started

and spread by unknown persons—merely confirmed what the community, district court, lawyers, and jurors already knew. In a small community where, as the prosecutor said, "everybody knows everybody," the community was tense and divided, and any verdict would be subject to criticism from someone in the community. The unsubstantiated rumors discussed in the post-trial hearing were unlikely to influence any juror under the circumstances presented. A determination of juror misconduct must be based on objective facts, and not mere speculation, conjecture, or rumor. *See State v. Piper*, 663 N.W.2d 894, 910 (Iowa 2003).

By way of comparison, the conduct in this case is less directed, purposeful, and influential than in other cases where courts have concluded the defendant was not denied the right to a fair trial. *See, e.g., Anderson*, 448 N.W.2d at 34–35 (fleeting conversation between juror and reserve special deputy, who declared, "what's this not guilty shit," was not basis for new trial). Even in instances of direct threats to the jury, which are absent here, courts have been reluctant to grant a mistrial or new trial based on external conduct in the absence of actual influence. *See United States v. Zelinka*, 862 F.2d 92, 96 (6th Cir. 1988) (finding the trial court did not err in denying the defendant's motion for mistrial where the jurors all testified at a hearing that their impartiality was not affected by implied threats made by spectators linked to the defendant.); *United States v. Pennell*, 737 F.2d 521, 534 (6th Cir. 1984) (finding trial court did not abuse its discretion by not granting a mistrial where several jurors received threatening telephone calls of which the other jurors became aware); *Wallace v. United States*, 412 F.2d 1097, 1102 (D.C. Cir. 1969) (finding no error where newspaper article detailed threats to jurors but

trial court found jurors could be impartial, that the responses of the jurors on voir dire indicated their commendable efforts to avoid reading comments on the trial, and that the special verdicts, including acquittal of two defendants on all counts and of two of the appellants on some counts, served to confirm the finding that the jury would be able to render an impartial verdict); *Letsinger v. United States*, 402 A.2d 411, 418 (D.C. 1979) (holding the trial court did not abuse its discretion in refusing to grant a mistrial where two jurors had overheard a threat by the victim's brother that he would get the jurors and kill them if they did not return a guilty verdict); *Davis v. State*, 770 N.E.2d 319, 326 (Ind. 2002) (concluding the defendant suffered no prejudice where the juror heard rumor the defendant's family made bomb threats against the courthouse); *Pertgen v. State*, 774 P.2d 429, 431 (Nev. 1989) (holding trial court did not err by denying the defendant's motion for mistrial where three jurors received anonymous telephone calls in which the caller offered them money if they voted for acquittal but threatened to kill them if they voted for conviction); *Silver v. State*, 737 P.2d 1221, 1224 (Okla. Crim. App. 1987) (finding the trial court did not err in refusing to grant a mistrial after the jury foreman reported that his family had been threatened); *Com. v. Bomar*, 104 A.3d 1179, 1212 (Pa. 2014) (holding defendant failed to establish prejudice where death threat was communicated to juror but the "threat was vague, its origins unknown," and was not attributed to the defendant); *State v. Young*, 866 S.W.2d 194, 196 (Tenn. Crim. App. 1992) (holding no prejudice where five jurors admitting to hearing of bomb threats against jury or having noticed unusual activity); *Ryan v. State*, 988 P.2d 46, 62 (Wyo. 1999) (finding comment from unidentified male that juror in

murder prosecution heard as she left courthouse and later reported to other jurors, that "we know who they are and they better find him innocent," did not require mistrial).

Second, and related to this latter point, I cannot conclude the jurors in this case were so infirm that they ignored their civic duty and the district court's repeated instruction to decide the case on the evidence merely because they heard unsubstantiated rumors from unknown sources of possible disturbances not directed at anyone in particular. Here, from the beginning of voir dire and throughout the course of trial, the district court repeatedly guided and admonished the jury it had to be fair and impartial and decide the case based on the evidence and argument at trial. On the first day of voir dire, before the jury was selected, the judge told the jury, "Now that you know what this case name is, please do not talk to anybody about the case. Don't do any research about the case. Don't do anything to gain information about this case. Our goal here is to end up with a jury, number one, and be sure that jury is fair and impartial." The district court repeatedly warned the jurors that media reports do not contain accurate information. Review of the voir dire transcript shows the jurors committed to deciding the case based on the evidence and not extraneous information about the case. The jury was instructed the defendant was presumed innocent and not guilty, the State had the burden to prove the defendant guilty beyond a reasonable doubt, and the determination of guilt or innocence must be based on "the evidence and the law" in the instructions. Instruction 13 provided the jury "shall base [its] verdict only upon the evidence and these instructions." Instruction 13 further

provided "[a]nything you saw or heard about this case outside the courtroom" was "not evidence." Instruction 15 provided the jury was to "[d]ecide the facts from the evidence." Instruction 37 provided each juror must decide the case for his or her self but only "after an impartial consideration of the evidence with the other jurors." Finally, instruction 38 provided:

> You may not communicate about this case before reaching your verdict. This includes cell phones, and electronic media such as text messages, Facebook, MySpace, LinkedIn, YouTube, Twitter, email, etc. Do not do any research or make any investigation about this case on your own. Do not visit or view any place discussed in this case, and do not use Internet maps or Google Earth or any other program or device to search for or to view any place discussed in the testimony. Also, do not research any information about this case, the law, or the people involved, including the parties, the witnesses, the lawyers, or the judge. This includes using the Internet to research events or people referenced in the trial.
> This case will be tried on evidence presented in the courtroom. If you conduct independent research, you will be relying on matters not presented in court. The parties have a right to have this case decided on the evidence they know about and that has been introduced here in court. If you do some research or investigation or experiment that we do not know about, then your verdict may be influenced by inaccurate, incomplete or misleading information that has not been tested by the trial process, including the oath to tell the truth and by cross-examination. All of the parties are entitled to a fair trial, rendered by an impartial jury, and you must conduct yourself so as to maintain the integrity of the trial process. If you decide a case based on information not presented in court, you will have denied the parties a fair trial in accordance with the rules of this state and you will have done an injustice.

The facts and circumstances of this case are not the extreme case in which we can infer the jury disregarded the district court's instructions to decide the case on the evidence presented. *See State v. Bolds*, 55 N.W.2d 534, 535–36 (Iowa 1952) ("Jurors have sworn to try the case in accordance with law and the instructions of the court, and [it] is only in extreme cases that we can presume they

have disregarded their oaths and ignored the strong direction of the court."); *Bergmeier*, 2001 WL 1203377, at *4 ("The court also instructed the jury when the case was submitted that its verdict was to be based only upon the evidence and the instructions, and that the evidence did not include anything seen or heard about the case outside the courtroom. We may presume the jurors followed the court's admonition.").

Third, and most important, we need not speculate on whether the alleged intrusions did, with reasonably probability, influence the jury's verdict. In this case, approximately three months after the jury returned its verdict, the district court held a hearing on the defendant's motion for new trial. Given the length of time between the trial and the post-trial hearing, there was some unsurprising inconsistency in the juror's respective testimony regarding who heard what and when. However, each of the jurors was specifically questioned regarding whether he or she had been exposed to or heard information regarding a potential riot *prior* to the jury reaching its verdict. Each juror answered the question in the negative. While the majority is correct that the verdict is not final until announced in open court, that legal proposition does not change the factual finding that these particular jurors testified they were unaware of the information until after the jury had already decided the case. While there may be some remote possibility a juror could have changed his or her verdict between the time of decision and the time the verdict was announced in open court, this remote possibility does not rise to the level of reasonably probability our case law requires. *See Riessen,* 425 N.W.2d at 669 (stating the reasonable probability requirement is not easy to satisfy).

If the facts and circumstances of this case—unsubstantiated rumors of possible disturbances directed at no one in particular posted on Facebook—were enough to establish an entitlement to new trial, no murder case could be tried in any community, let alone a smaller community. This is particularly true in an era where information is available on the Internet, on television, on radio, and in the newspaper; where people rapidly exchange information via email, text message, direct message, and public messaging platforms; where smart phones push local news and information to the user; where members of the community are more connected via social media platforms; and where the social media platforms also push information to the user. For example, in *Webster*, I noted in dissent the defendant failed to prove the denial of a right to fair trial due, in part, to the extensive interconnectedness of persons in smaller communities:

> The nature of the relationship between the juror and the victim's family, in and of itself, is not grounds for finding bias. The relationship is not of the type from which bias is necessarily inferred and that would support a challenge for cause. *See* Iowa R.Crim. P. 2.18(5). In fact, the relationship was attenuated—the juror's daughter was high school friends with the victim's half-sister or stepsister. The victim's mother was included in the juror's Facebook social network, but that fact alone does not indicate a meaningful relationship. *See Sluss v. Commonwealth*, 381 S.W. 215, 222 (Ky.2012) (noting on Facebook "a person can become 'friends' with people to whom the person has no actual connection"); *see also id.* n.8 (noting the performer Lady Gaga had millions of Facebook "friends"). Also, the inference of bias that could be drawn from the relationship between the juror and the victim's family, if any, is mitigated by the fact the juror also had a relationship to the defendant's family—the juror's parents were good friends of the defendant's wife's family. The juror was also Facebook friends with one of Webster's wife's relatives.

State v. Webster, No. 13-1095, 2014 WL 5861967, at *15 (Iowa Ct. App. Nov. 13, 2014) (McDonald, J., dissenting), *vacated by State v. Webster*, 865 N.W.2d 223.

The defendant's right to a fair trial is a foundational right, but he has not established the district court abused its discretion or otherwise erred in concluding the defendant failed to prove his right to a fair trial was compromised in this case. The fact that an unsubstantiated rumor was spread on a social media platform does not change the analysis. The defendant's claim is old wine in a new bottle. Our courts have long-settled rules and principles governing jury misconduct and intrusion of any type. Long ago, the Iowa Supreme Court stated:

> In fact, it must be apparent that to follow the narrow rule of the Caine case would be to vitiate verdicts in almost all cases in which the jury is not strictly segregated. The citizens of Iowa are highly literate; they are interested in world affairs, and in the news of their state and of their communities. They follow events closely; and the fact of their selection as members of a jury does not automatically eliminate their desire to keep up with the times. When they are permitted to disperse at adjournments of the trial, it is inconceivable that they will not read newspapers and listen to telecasts and broadcasts. No matter how conscientiously they may try to avoid reading or listening to accounts of the trial in progress, and especially when the case is one which has aroused considerable interest, they will be faced with headlines or will advertently hear some comment from a newscaster concerning the matter before them.

> But each juror has taken an oath which requires him to try the case solely upon the evidence submitted, guided by the court's instructions. We think a rule which assumes as a matter of law that the mere reading or listening to newspaper or television or radio broadcasts of accounts of the trial is prejudicial misconduct of the jury goes too far, and we decline to follow it. Insofar as State v. Caine and State v. Peirce, announce such a rule they are overruled. We hold the true rule to be that reading or listening to reports of or comments on a trial in progress, by the jurors, or some of them, is not necessarily prejudicial error. Something must appear which leads to the conclusion that the jury was unfairly influenced by these extraneous matters; and in determining this, the trial court has a considerable, although not always final, discretion.

*State v. McLaughlin*, 94 N.W.2d 303, 309–10 (Iowa 1959). In the same vein, the United States Supreme Court has stated:

[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

*Smith*, 455 U.S. at 217. I respectfully dissent.