# IN THE COURT OF APPEALS OF IOWA

No. 17-0802
Filed April 18, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MANUEL ALLEN SILVA JR.,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Union County, Dustria A. Relph,

Judge.


        The defendant appeals his two convictions of sexual abuse in the third

degree.  **AFFIRMED.**


        Steven P. DeVolder of DeVolder Law Firm, P.L.L.C., Norwalk, and William

L. Kutmus of Kutmus, Pennington & Hook, P.C., West Des Moines, for appellant.

        Thomas J. Miller, Attorney General, and Kyle P. Hanson, Assistant Attorney

General, for appellee.


        Considered by Tabor, P.J., McDonald, J., and Blane, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**BLANE, Senior Judge.**

Manuel Silva Jr. appeals both of his convictions of sexual abuse in the third degree. Silva raises a number of claims, including that he should be granted a new trial because of juror bias, juror misconduct, and the jury being improperly instructed that it could convict him without reaching a consensus as to the means of the crime. Silva also maintains trial counsel provided ineffective assistance because they failed to object to voir dire questions by the prosecutor that tainted the jury pool and to vouching statements by medical personnel during trial.

**I. Procedural Background.**

In August 2015, Silva was arrested and charged with two counts of sexual abuse in the third degree. The complaints alleged Silva had committed two sex acts, digitally penetrating the vagina of the complaining witness and placing his exposed penis in the complaining witness's hand against her will and while she was incapacitated and unable to consent.

The matter proceeded to trial in October 2016, and the jury returned a general guilty verdict on both counts of sexual abuse in the third degree.

After trial Silva retained new counsel and filed a motion for new trial and in arrest of judgment. The matter came on for hearing in May 2016, after which the district court denied Silva's motions and entered judgment, sentencing Silva to two ten-year terms of incarceration to be served concurrently.

Silva appeals.

**II. Discussion.**

**A. Juror Bias.**

Silva maintains he was denied a fair trial due to impermissible juror bias and claims the district court should have granted his motion for new trial. *See* Iowa R. Crim. P. 2.24(2)(b)(9) (providing the court may grant a motion for new trial when "the defendant has not received a fair and impartial trial"). We review a denial of a motion for new trial based on juror bias for an abuse of discretion. *State v. Webster*, 865 N.W.2d 223, 231 (Iowa 2015).

"Juror bias may be actual or implied." *Id.* at 236. "Actual juror bias occurs when the evidence shows that a juror, in fact, is unable to lay aside prejudices and judge a case fairly on the merits," whereas "[i]mplied bias arises when the relationship of a prospective juror to a case is so troublesome that the law presumes a juror would not be impartial." *Id.*

Here, Silva maintains two of the jurors on his jury were both actually and implicitly biased. He asserts that Juror Ward and Juror Reeves were actually biased because they concealed their relationships with the complaining witness during voir dire in order to be empaneled and were presumptively biased because both jurors, as well as Silva, Silva's family, and the complaining witness, all attended the same church.

While we recognize that it is of "particular concern" that a juror would "decline[] to truthfully answer a voir dire question in order to avoid being removed from the jury panel," *id.* at 237, there is no credible evidence that such an occurrence happened here. Both Jurors Ward and Reeves were subpoenaed to testify at Silva's hearing on the motion for new trial, and both testified under oath that although each was a member of the complaining witness's church—along with

approximately 280 to 300 other members—they did not know the complaining witness or Silva before the trial. Silva maintains such lack of familiarity is "implausible on its face," but the district court found the jurors' testimony credible.

Even if we credit the testimony of Silva's family members[1] about various interactions they witnessed between the jurors in question and the various members of the family—that the jurors had been seen shaking hands with the family members during a portion of the church service where all members were to shake hands with other members and the jurors and family members both participated together in certain church functions—such interactions do not establish actual bias. "The mere fact a juror has knowledge of parties or witnesses does not indicate actual bias or require juror disqualification." *Id.* at 238. Additionally, such a relationship is not so close or dependent as to rise to the level of implied bias. *See id.* at 236 ("Implied bias has been found to arise, for instance, when a juror is employed by a party or is closely related to a party or witness."). As our supreme court has cited with approval, a "juror's knowledge of, or non-familial relationship with, a witness, attorney, or party provides a basis for disqualification only if it is shown that it has resulted in the juror having a fixed opinion of the accused's guilt or innocence or a bias for or against the accused." *Green v. State*, 757 S.E.2d 856, 858–59 (Ga. 2014); *see also Webster*, 865

---

[1] We note, as the district court did:

> [I]f Silva or the [complaining witness's] family if they are so connected with the members of the church the [Juror] Reeves and [Juror] Ward should have known of Mr. Silva and his family, the reverse would also be true. Mr. Silva sat here and participated during jury selection, as did—a number of his family members were present also. So if they would have known Mr. Silva, it would be expected that he might know of them or know of the names too. None of that was raised before jury selection was complete or at any part of the trial for that sake.

N.W.2d at 239. Nothing in the record before us indicates that the jurors in question had a fixed opinion of Silva's guilt before trial.

The district court did not abuse it discretion in denying Silva's motion for new trial based on the claim two jurors had actual or implied bias.

**B. Juror Misconduct.**

Silva maintains he was denied a fair trial due to jury misconduct and claims the district court should have granted his motion for new trial. *See* Iowa R. Crim. P. 2.24(2)(b)(2) (providing the court may grant a motion for new trial when "the jury received any evidence, paper or document out of court not authorized by the court"). We review a denial of a motion for new trial based upon juror misconduct for an abuse of discretion. *Webster*, 865 N.W.2d at 231.

Here, Silva maintains we should find juror misconduct because jurors Reeves and Ward, approximately one year before being empaneled, received communications from their church leadership that Silva was guilty.

The following principles apply in determining whether a new trial is warranted for juror misconduct:

> (1) evidence from the jurors must consist only of objective facts as to what actually occurred in or out of the jury room bearing on misconduct; (2) the acts or statements complained of must exceed tolerable bounds of jury deliberation; and (3) it must appear the misconduct was calculated to, and with reasonable probability did, influence the verdict.

*Id.* at 234 (quoting *State v. Cullen*, 357 N.W.2d 24, 27 (Iowa 1984)).

The pastor testified at the hearing on the motion for new trial that he had discussed the allegations against Silva at a "members meeting" at the church one Sunday evening in October 2015. The pastor could not recall specifically who

attended that specific meeting—no roll call was taken—but he testified he could not recall ever seeing Juror Ward or Juror Reeves at a members meeting. After meetings, minutes are written and put in "family mailboxes" at the church for each family to review. The written minutes from that specific meeting included a section entitled "Silva Statement from the Pastor," which stated:

> As you may know, how our church is to deal with this specific matter is not outlined in detail in our Constitution. Because there were no witnesses to this offense, this is not a Matthew 18 or a 1 Corinthians 5 matter.
>
> Your pastors and deacons have had lengthy meetings and even special meetings . . . discussing what needs to be done, what should be done, and what should be said.
>
> The difficulty of this matter pivots on four elements:
>
> ELEMENT #1: The charges are "credibility robbing" charges . . . They are serious. And, in no way, do I wish to convey an attitude of condoning, over-looking, or "sweeping under the rug," the sobering nature of this situation.
>
> ELEMENT #2": In its current context, the matter stands as a "she said"/"he said" situation. Again, the situation is different from 1 Corinthians 5, where the sin was open, visible, and known. Although there may be the appearance of the likelihood of guilt, none of us were witnesses to the offense.
>
> ELEMENT #3: The courts were very careful through the time of their investigation[2], and, even more, we, as a church, should be even more careful.
>
> ELEMENT #4: The situation leans toward the appearance of guilt, and when substantiated through the God-ordain[ed] civil leaders . . . and . . . if these elements are not met with repentance . . . these charges are grounds for removal [from the church].
>
> We want to walk through this situation with godly wisdom, patience, and prudence. We also recognize that there are questions that need to be answered before formal church action may be required.
>
> In the meanwhile, we like to encourage prayers for those involved in the situation, for the Silvas, and our church family (especially, keeping a watchful eye on our women and children and offering protection for our women and children).

---

[2] As of October 2015, Silva had been formally arrested and charged, but no adjudication had taken place.

(Alterations in original.)

Juror Ward was not asked if he attended the members meeting in question or if he read that particular set of minutes, but he testified he usually only attends the Sunday morning church services. When asked if he was required by church bylaws to read the minutes, Ward testified, "I guess I never really—I mean, I read them, but I don't really look at them." Juror Reeves testified she "hardly ever go[es] to Sunday evening services, so probably [she] was not" at the October meeting; she did not have any recollection of hearing the pastor discuss the allegations. She also testified that all of the minutes from meetings are placed in their mailboxes, "[s]o [she] probably received" the one in question, although she did not remember receiving or reading that particular one.

While "[t]here can be no question that communications with third parties about the merits of the case outside the confines of jury deliberations is a species of misconduct," there is no evidence Juror Ward or Juror Reeves were part of any discussion about the case in the church or relied on—or even read—the minutes from the pastor when reaching their decision. *See id.* at 235. We find no juror misconduct here. Moreover, even if we did, we would not find such action "was calculated to, and with reasonable probability did, influence the verdict." *Id.* at 235–36.

The district court did not abuse its discretion in denying Silva's motion for new trial based on juror misconduct.

**C. Alternative Means.**

Silva was accused of committing sexual abuse in the third degree in two alternative ways—that he performed the sex act by force or against the

complaining witness's will, *see* Iowa Code § 709.4(1)(a) (2015), or that he performed the act while she was "mentally incapacitated, physically incapacitated, or physically helpless," *see id.* § 709.4(1)(d). Over Silva's objection, the court instructed the jury it could find Silva guilty of the offenses if it determined he performed the sex acts by one of the alternative means, even if it did not reach unanimous agreement about which of the means he utilized. The pertinent instructions provided that the State had the burden to prove that Silva performed the specific sex act, and:

> 2. At that time, the Defendant either:
>     a. performed the sex act by force or against the will of [the complaining witness], OR
> 2. At that time, the Defendant
>     b. performed the sex act at a time when [the complaining witness] was physically helpless AND
>     c. the defendant knew or reasonable should have known that [the complaining witness] was physically helpless.

Silva maintains the jury should have been required to reach a unanimous agreement as to the means of the sex abuse in order to convict him of the charges. We review challenges to jury instructions for correction of errors at law.[3] *State v. Ambrose*, 861 N.W.2d 550, 554 (Iowa 2015).

At the root of Silva's argument "is the principle that the unanimity rule 'requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged.'" *State v. Bratthauer*, 354 N.W.2d 774, 776 (Iowa 1984) (citation

---

[3] Insofar as Silva's claim implicates whether there was sufficient evidence to instruct the jury on both means, we also review sufficiency-of-the-evidence claims for correction of errors at law. *See State v. Schlitter*, 881 N.W.2d 380, 388, 390 (Iowa 2016) (considering whether there was sufficient evidence for a jury to be instructed to consider each of the alternative theories of guilt).

omitted). "If 'substantial evidence is presented to support *each* alternative method of committing a single crime, and the alternatives are not repugnant to each other, then unanimity of the jury as to the mode of commission of the crime is not required.'" *State v. Conger*, 434 N.W.2d 406, 409 (Iowa Ct. App. 1988) (quoting *State v. Duncan*, 312 N.W.2d 519, 523 (Iowa 1981)). "The first step is to determine whether the statute defines a single offense which may be committed in more than one way or instead defines multiple offenses." *Id.* (citing *Bratthauer*, 354 N.W.2d at 776). This question is one of legislative intent. *Id.* "The second step of the inquiry is to determine if the alternative modes are consistent with and not repugnant to each other." *Id.* The second step involves the application of the constitutional test. *Bratthauer*, 654 N.W.2d at 776.

Here, Iowa Code section 709.4(1)(a) and (d) define two circumstances that, when combined with performing a sex act, result in the commission of sexual abuse in the third degree. "These subparagraphs clearly define alternative conduct that in a single occurrence can result in only one conviction of a crime." *Conger*, 434 N.W.2d at 409. Thus, the first step is satisfied.

Next, we must consider whether substantial evidence was presented to support each means. *Duncan*, 312 N.W.2d at 523. Silva argues there was insufficient evidence to support a finding that a sex act occurred by force or against the complaining witness's will, but he does not explicitly challenge whether the State presented substantial evidence that the sex act occurred when the complaining witness was mentally incapacitated, physically incapacitated, or physically helpless.

Substantial evidence supports both of the alternatives. The complaining witness testified during direct examination:

> Q. You said he fingered you. What—[complaining witness], what do you mean by that? Explain it for the jury. A. He took his fingers and—
> Q. Where did he put his fingers? A. In my vagina.
> Q. Was that against your will? A. Yes.
> . . . .
> Q. You stated that he took your hand and caused you to touch his penis. How did he do that? Please tell the jury. A. He took my hand and he, like, pulled it down by his pants. And then he grabbed—he went and undid his pants and grabbed his penis and brought it out and made me hold it.
> Q. Was that against your will? A. Yes.

The complaining witness testified unequivocally that the sex acts were against her will. *See State v. Hildreth*, 582 N.W.2d 167, 170 (Iowa 1998) (holding the "victim's testimony is by itself sufficient to constitute substantial evidence of defendant's guilt" even when not supported by physical evidence). Additionally, it is not necessary to show any resistance on the part of the complaining witness in order to establish that the sex abuse was committed by force or against her will. *See* Iowa Code § 709.5; *see also State v. Meyers*, 799 N.W.2d 132, 143 (Iowa 2011) ("Thus, nonconsent under the 'against the will' language of section 709.4(1) does not rely on the existence of physical resistance."). Instead, we consider "the circumstances surrounding the commission of the act" meaning "*all* the circumstances, subjective as well as objective." *Meyers*, 799 N.W.2d at 143 (citations omitted). Here, the witness testified that Silva served her a smoothie he prepared, watched her drink it, and then took her cup. "The next thing [she] remembered [was] rolling over in the middle of the night and looking at [her] phone." She then "saw [Silva] sitting beside the couch in the dark," and he asked

if he could lay on the couch with her. She said yes, and he proceeded to lie down. At the time, she was "fading in and out. . . . [She] kept falling asleep and waking back up." Silva then started kissing her, and she "couldn't really do anything because the back of the couch was right there. [She] tried to push, but [she] couldn't go anywhere." Silva then put his fingers in her vagina and his penis in her hand. At the time, she "was dizzy, and [she] was fading in and out. [Her] body felt like it couldn't move at all." Later testing of her urine showed the complaining witness had benzodiazepines in her system, which is a class of prescription drugs that can act as sedatives. She testified she had not taken prescription medications during that time period and was not then prescribed any medications. The jury was free to believe Silva had drugged the complaining witness and thus was aware she was mentally incapacitated[4] or physically helpless[5] at the time of the sex acts.

Finally, we consider whether the two alternatives "are consistent with and not repugnant to each other." *Conger*, 434 N.W.2d at 409. Although Silva maintains the two means do "not overlap," section 709.1(1) specifically provides when "the act is done while the other is under the influence of a drug inducing sleep . . . , the act is against the will of the other." "Clearly, the 'against the will of another' standard seeks to broadly protect persons from nonconsensual sex acts" because "[a] person who imposes a sex act on another by force or compulsion

---

[4] Iowa Code section 709.1A(1) defines "mentally incapacitated" to mean "that a person is temporarily incapable of apprising or controlling the person's own conduct due to the influence of a narcotic, anesthetic, or intoxicating substance."

[5] Section 709.1A(2) defines "physically helpless" to mean "that a person is unable to communicate an unwillingness to act because the person is unconscious, asleep, or otherwise physically limited."

under any circumstance violates the other's protected interest." *Meyers*, 799 N.W.2d at 143.

Under these facts, allowing the jury to convict Silva of sexual abuse in the third degree without reaching a unanimous agreement on the means of the crime did not violate the rule of unanimity, so the court did not err in instructing the jury.

### D. Ineffective Assistance.

Finally, Silva maintains his trial counsel provided ineffective assistance. He specifically contends trial counsel breached an essential duty during voir dire when the prosecutor "purposely solicited expert testimony from two potential jurors"—a physician and a first responder—and trial counsel failed to object. He also maintains trial counsel was ineffective for allowing the prosecutor to elicit testimony from one of the State's witnesses—the paramedic working intake when the complaining witness visited the emergency room—to testify that "based on [her] training and experience" she felt "that the information [she] obtained [from the complaining witness] was consistent with what she observed."

Although a defendant may raise claims of ineffective assistance on direct appeal if he or she believes the record is adequate for us to decide the claim, "[o]rdinarily, we do not decide ineffective-assistance-of-counsel claims on direct appeal." *State v. Tate*, 710 N.W.2d 237, 240 (Iowa 2006). "We prefer to reserve such questions for postconviction proceedings so the defendant's trial counsel can defend against the charge." *Id.* "Improvident trial strategy, miscalculated tactics, and mistakes in judgment do not necessarily amount to ineffective assistance of counsel." *State v. McKettrick*, 480 N.W.2d 52, 55 (Iowa 1992). Moreover, while Silva invites us to conclude that the statements during voir dire "were so prejudicial

as to warrant our presumption that at least one (and likely more) of the actual jurors became tainted," we would rather wait for a record that allows Silva to establish whether he suffered prejudice. *See State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010) ("[D]efendants are no longer required to raise ineffective-assistance claims on direct appeal, and when they choose to do so, they are not required to make any particular record in order to preserve the claim for postconviction relief.").

Because we are unable to decide Silva's claims of ineffective assistance on direct appeal, we preserve them for possible postconviction relief.

**III. Conclusion.**

Because the district court did not abuse its discretion in denying Silva's motion for new trial based on juror bias and juror misconduct and the court did not err in instructing the jury that it could convict Silva of sexual abuse in the third degree without unanimously agreeing as to the means of the crime, we affirm. We preserve Silva's claims of ineffective assistance for possible postconviction relief.

**AFFIRMED.**