# IN THE COURT OF APPEALS OF IOWA

_____

No. 24-1746
Filed April 15, 2026

_____

**State of Iowa,**
Plaintiff–Appellee,

v.

**Justice Mathis,**
Defendant–Appellant.

_____

Appeal from the Iowa District Court for Decatur County,
The Honorable Patrick W. Greenwood, Judge.

_____

**CONVICTIONS AFFIRMED, SENTENCE VACATED IN PART,
AND CASE REMANDED**

_____

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson,
Assistant Appellate Defender, attorneys for appellant.

Brenna Bird, Attorney General, and Sheryl Soich, Assistant Attorney
General, attorneys for appellee.

_____

Considered without oral argument
by Chicchelly, P.J., Langholz, J., and Vogel, S.J. Buller, J., takes no part.
Opinion by Langholz, J.

1

**LANGHOLZ, Judge.**

A jury convicted Justice Mathis of three counts of second-degree sexual abuse for his conduct between October 2015 and November 2017—while he was a juvenile—sexually abusing his two younger cousins. And the district court suspended his indeterminate prison sentence totaling fifty years, placed Mathis on probation for five years, and imposed a lifetime special sentence under Iowa Code section 903B.1 (2015). Mathis now appeals his convictions and sentences, raising two claims.

First, he argues that the district court should have granted a new trial because the jury was improperly influenced by an incident that occurred on the morning of closing arguments. As one of the jurors was parking, she was approached by a man who she recognized as having sat in the front row of the gallery behind Mathis throughout trial. She believed he was about to say something to her, so she drove to the other side of the courthouse to park. And while the court made the juror an alternate—so she did not participate in deliberations—she had already told some other jurors about the incident.

Second, Mathis argues that the court abused its discretion in imposing the lifetime special sentence because it was unaware that it had discretion to suspend the sentence since Mathis was a juvenile at the time of the offenses.

Mathis's first argument fails. Because Mathis did not show a reasonable probability that the extraneous information about the incident influenced any juror, the court appropriately denied his new-trial motion. We thus affirm his convictions. But on his second, Mathis has met his burden to show that the court was unaware that it had discretion to suspend the lifetime special sentence. And so, we must vacate the special sentence and remand for resentencing on that portion of the sentence so that the district court may consider whether to suspend the lifetime special sentence in whole or part.

## I. Background Facts and Proceedings

In November 2017, a seven-year-old boy and his nine-year-old sister reported that they had been sexually abused by their cousin—Mathis—and their step-grandfather at their grandparents' house over the past two years. Mathis and the step-grandfather were both charged with multiple counts of second-degree sexual abuse—a class "B" felony. *See* Iowa Code §§ 709.1, .3. And after a joint trial in late 2019, Mathis was convicted of three counts and the step-grandfather was convicted of two. The step-grandfather was sentenced to two consecutive twenty-five-year indeterminate sentences, with a seventy-percent mandatory minimum, and a lifetime special sentence.

Because Mathis was a juvenile at the time of his offenses, the district court had the discretion to "suspend [his] sentence in whole or in part, including any mandatory minimum sentence, or with the consent of [Mathis], defer judgment or sentence, and place [Mathis] on probation upon such conditions as the court may require." Iowa Code § 901.5(14).[1] At an extended sentencing hearing, the court received victim impact statements from the two children and their mother and heard testimony from two

---

[1] In both the statute in effect at the time of Mathis's offenses and the current statute, the provision authorizing sentencing discretion for juveniles is subsection 14. *Compare* Iowa Code § 901.5(14) (2015), *with* Iowa Code § 901.5(14) (2026). But because of an amendment striking another subsection in 2018, for most of the time this case was pending, the provision was renumbered as subsection 13. *See, e.g.*, Iowa Code § 901.5(13) (2020); Iowa Code § 901.5(13) (2023); *see also* 2018 Iowa Acts ch. 1172, § 102 (striking subsection 10). The district court and the parties thus sometimes referred to subsection 13 during the trial proceedings, and the parties have continued to do so in their briefing on appeal, despite the provision returning to subsection 14 in the 2024 Iowa Code—apparently because of the code editor's renumbering of subsection 8A as subsection 9 and adjusting the other later subsections accordingly. *Compare* Iowa Code § 901.5(8A)–(13) (2023), *with* Iowa Code § 901.5(9)–(14) (2024). We consistently cite the 2015 Iowa Code.

witnesses called by Mathis—the supervisor of the sex offender treatment program in which Mathis would participate if placed on probation and a retained expert on adolescent sex offenders. The State argued that Mathis should still be sentenced to prison with some mandatory minimum term of incarceration at a length the court found appropriate. Mathis argued for a deferred judgment or at least a suspended sentence.[2] The court rejected Mathis's request for a deferred judgment but did suspend Mathis's indeterminate prison sentences totaling fifty years.[3] It also imposed a lifetime special sentence, noting it was "required by Iowa Code section 903B.1."

We affirmed the step-grandfather's convictions and sentences on appeal. *See State v. Atkins*, No. 20-0488, 2021 WL 3895198, at *1 (Iowa Ct. App. Sep. 1, 2021). But Mathis's conviction was reversed because of a jury instruction error. *See State v. Mathis*, 971 N.W.2d 514, 521 (Iowa 2022). So his case was remanded and proceeded to trial again in June 2024.

On the morning of closing arguments—the fourth and final day of the second trial—a man approached a female juror as she was parking her truck in the courthouse parking lot. She recognized him from the trial—he had been sitting in the front row of the gallery behind Mathis every day. Because he was walking directly toward her cracked-open window, she thought he was

---

[2] In arguing that a suspended sentence with probation would still be sufficient, Mathis's counsel explained, "So if his present sentence is suspended, probation is still punishment, and the punishment continues in the form of the special sentence for life. Because if he is in fact convicted, a special sentence is mandatory. He will be getting a special sentence for—for life."

[3] The court ordered two of the twenty-five-year sentences—one for each victim— to be served consecutively. The third, which was for a second incident of sexual abuse involving the same victim, was ordered to be served concurrently. The court also ordered that no mandatory minimum prison sentence would apply.

about to talk to her. The juror immediately rolled up her window and drove to the other side of the parking lot. The man said nothing to the juror.

The encounter came to the court's attention later that morning because the juror sent a Snapchat message to the Lamoni police chief—who was also a witness in the case—saying, "I'd like to have an escort to the vehicle when we are over." The police chief reported the message to the prosecutor, who alerted Mathis's counsel and the court. The court then questioned the juror on the record in chambers. The juror described what happened and told the court that other jurors were also aware. She explained, "I did speak of [the encounter] when I got to the jury room, because I was visibly shaken and trying to decide exactly how to handle that situation."

Upon returning to the courtroom, the court admonished the man—who was again in the gallery—for violating the decorum order posted on the courtroom door and the court's oral reminders during the trial not to talk to the jurors. And so, the court ordered him to leave the courthouse grounds.

Mathis then moved for a mistrial, arguing that "the jury has been so tainted that [Mathis] absolutely cannot get a fair and impartial trial with this jury." During his argument, Mathis's counsel made professional statements that the man lived with Mathis, was friends with another witness, and had been sitting together with a group of people—including Mathis's grandmother—in the gallery immediately behind the defense counsel table. He also made a professional statement that Mathis would testify that "at various times" during breaks in the trial, Mathis saw "jurors when he has been with [the man] in the courthouse."

The court denied Mathis's motion for a mistrial, finding that there was "no proof that there's a nexus to attribute [the man] to [Mathis] in the eyes

of the jurors." The court also noted that while the juror was concerned about the encounter, the man "didn't communicate anything with her, and we haven't determined that he intended to." And it reasoned that there was insufficient proof to "overcome the presumption that the jurors will follow the court's rules and admonitions."

But the court still granted Mathis's request to designate the juror as the alternate and excused her from any further service, reasoning that this would "eliminate the potential that she can't, despite the instruction, simply put aside the emotion that she has felt by perceiving that this man wanted to influence her in some way." The court also decided to add a "more precise jury instruction" that instructed the jury:

> Do not assign blame to either party for delays or for any event occurring outside the courtroom during the trial of this case. If you learned of any such event, do not let that information influence your decisions. Base your decisions solely on the evidence presented in the courtroom.

After spending the full morning addressing this issue and unrelated matters to finalize the jury instructions, the trial reconvened for closing arguments after lunch. The jury then deliberated for about an hour and a half and found Mathis guilty of three counts of second-degree sexual abuse.

Ten days after the verdict, Mathis moved for a poll of the twelve jurors who deliberated and the alternate juror who was excused "to determine the extent and nature of any exposure to outside information or influence" on the jury as a result of the encounter on the last day of trial. The State resisted. But the court agreed with Mathis and scheduled a hybrid hearing—with the parties and the court in the courtroom and the jurors appearing one-by-one on Zoom "to limit the contact that the jurors would have with one another as they come and go from the courthouse"—for questioning by the court.

The hearing was held the next month—nearly two months after the last day of trial. The alternate juror who was approached by the man was asked one set of questions. She testified that she did not recall which jurors were not present when she disclosed that a man approached her vehicle. She did not think that she told the other jurors where the man had been seated in the gallery, but did tell them "that I assumed he was with the defendant considering he rode to the courthouse with the defendant's grandma," and "might have given them a description" of the man. She answered that no juror indicated to her that they associated the man with the State or Mathis. When asked if she told the other jurors that she was afraid of or intimidated by the man, she responded, "No, I don't think I said that. I think it was more along the lines of I just wasn't sure what to do about the situation." And she confirmed that on the final day of trial, after speaking with the court and the lawyers in the "small courtroom," she did not return to the jury room.

The twelve jurors that deliberated on and decided the case were all asked the same four questions:

1) Did you hear anything about another juror being approached by someone prior to your deliberations?

2) When did you learn this information?

3) What information did you learn?

4) Did you follow my instructions throughout trial?

Eleven of the twelve jurors testified that they had heard something about another juror being approached by someone. Each of those learned this sometime while they were waiting in the jury room on the morning of the last day of trial. The precise details that they heard varied. Some knew nothing more than "[s]omeone approached a person, and that was it." While others had spoken directly with the alternate juror who was approached.

Only two jurors mentioned that the man who approached had been at the trial. One testified that he heard "that one of the guys that was there watching the trial walked up to her window," and "didn't say anything, and she rolled her window up" and "moved her vehicle and parked on the opposite side of the square from where he was located." And the other testified that the alternate juror "came in and said someone had approached her that was part of—like, the people there for [Mathis], but she didn't share what was—like, what happened exactly. She said she just got in her truck and left. That's all I heard." This was the only juror who was aware of any connection between the man who approached the alternate juror and Mathis. All the jurors said that they followed the court's instructions throughout trial.

Based on the jury poll, Mathis moved for a new trial, arguing that "the Jury's exposure to extraneous information and/or juror misconduct prevented [Mathis] from receiving a fair trial." (capitalization modified). Mathis relied on three grounds under Iowa Rule of Criminal Procedure 2.24(2)(b). *See* Iowa R. Crim. P. 2.24(2)(b)(2) ("When the jury has been prejudicially exposed to information the jury was not authorized to receive."); *id*. r. 2.24(2)(b)(3) ("When the jurors . . . have been guilty of any misconduct tending to prevent a fair and just consideration of the case."); *id*. r. 2.24(2)(b)(8) ("When from any other cause the defendant has not received a fair and impartial trial."). He highlighted that all but one of the jurors were aware of another juror "being approached prior to entering their deliberations," some saw her "visibly shaken," and one of the jurors was aware that the man who approached was associated with Mathis. Thus, he "contend[ed] that any such extraneous information given to the rest of the jurors may have been calculated to and did influence the jury's verdict in this case" and that Mathis "was denied his right to a fair and impartial trial under the U.S. and Iowa Constitutions."

Ruling from the bench at the start of a combined posttrial-motions and sentencing hearing, the court denied Mathis's motion for a new trial. After citing the test for juror misconduct applied in *State v. Folck*, 325 N.W.2d 368, 372–73 (Iowa 1982), the court reasoned that Mathis "presented no evidence to raise even the barest suspicion that the jury was guilty of misconduct tending to prevent a fair and just consideration of the case." The court found that the alternate juror who was "approached by the trial observer[] did not participate in deliberations" and "only one juror believed that the trial observer was a supporter of [Mathis]." The court also relied on its many jury instructions, including its specific instruction added to address this issue. And it explained that limited nature of the information the jurors were exposed to—learning only "that a trial observer communicated nothing to [the alternate]," that "[t]he observer walked in her direction, and [the alternate] left the area." So the court concluded, "No message was transmitted from the observer through [the alternate] to the jury." And even if some jurors saw that the alternative "was visibly shaken," it did not constitute pervasive exposure of extraneous information—noting that one of the jurors was not aware of anything occurring at all.[4]

The court then turned to sentencing Mathis. Mathis again called his expert on adolescent sexual offenders. The State also submitted a report from its own expert. Mathis exercised his right of allocution. And the court again received three victim-impact statements.

---

[4] The court also denied Mathis's request for a new trial based on a claim that the verdict was contrary to the weight of the evidence and his motion in arrest of judgment challenging the sufficiency of the evidence. Mathis did not appeal these rulings.

The parties reprised their core arguments from the first sentencing.[5] The State again asked for the court to impose indeterminate prison sentences—rather than suspending them—and to require two of the three twenty-five-year sentences to be served consecutively.[6] It also asked that he "be required to successfully complete all the requirements under the Iowa law in reference to a sexual abuse in the second degree," specifically mentioning that he "be required to successfully complete the sex offender treatment program," "placed on the sex offender registry for a period of life," and "subject to the special sentence upon his parole."

Mathis again asked to be placed on probation with either a deferred judgment or a suspended sentence. His attorney elaborated:

> [T]he big difference for Mr. Mathis and for the Court, I think, is that if Mr. Mathis is ultimately successful on a deferred judgment, if he gets that outcome, at the end of the day, he will not have a special sentence. He will still have a lifetime on the sex offender registry. That will be required no matter what we do here today. . . .
>
> And, so, I think that gives Mr. Mathis—my argument for a deferred is that gives Mr. Mathis the keys to his own future. And that gives Mr. Mathis the keys to his own future on a five-year probation because if he doesn't complete sex offender treatment programming or if he doesn't—isn't successful on probation, he is not only looking at a term of prison, maybe even not without a mandatory, but he is looking at lifetime on a special sentence. It also provides the Court the opportunity to delay to a different day whether he gets a mandatory so at—to some extent, Mr. Mathis—if he were to argue for probation, there is a finite outcome if the Court doesn't grant a mandatory. If I'm arguing for probation, but with no mandatory minimum the sentence is imposed. And, so, the worst thing that can happen to him if—say it's a 50-year suspended sentence, the worst

---

[5] The State was represented by the same prosecutor. Mathis had new counsel.

[6] Unlike the first sentencing, the State did not expressly ask for any mandatory-minimum prison term to be imposed.

thing that can happen to him is he is going to be revoked, and he is going to be sent for a 50-year indeterminate term. If he gets a deferred judgment, the worst thing that can happen to him is the Court can revoke his deferred judgment, order a new PSI, and the Court can make a determination at that point whether a mandatory minimum is applicable or not because the Court will have all the—of the options again available to it to sentence him at that time. So that is kind of in a nutshell my argument for the deferred.

The district court imposed the same sentence that it did more than four years earlier—suspending his indeterminate prison sentence totaling fifty years, placing Mathis on probation for five years, and imposing a section 903B.1 lifetime special sentence. The court began by describing its added sentencing discretion under Iowa Code section 901.5(14) because Mathis was a juvenile at the time of the offense. But it did not include in its itemization of its discretionary choices any discretion to suspend the lifetime special sentence. And the court then gave a detailed explanation—extending over thirteen pages of the sentencing transcript—of why it again selected a suspended sentence rather than a deferred judgment or a prison sentence and why it again decided to order two of the sentences to be served consecutively to each other. But it gave no such reason for its imposition of the special sentence, saying only: "Pursuant to 903B.1, you are committed to the Department of Corrections for the remainder of your life, but you are eligible for parole. This is an additional sentence to the underlying three 25-year terms. It commences upon completion of those sentences."

Mathis now appeals his conviction—challenging the denial of his motion for a new trial—and his lifetime special sentence—arguing that the court was unaware it had discretion to suspend it.

## II. New Trial for Extraneous Influence on the Jury

Mathis first argues that the district court abused its discretion in denying his motion for a new trial based on the incident on the trial's last day.[7] Although Mathis asserted multiple legal theories for relief in the district court, on appeal he frames the issue as one of extraneous influence on the jury—a subset of juror misconduct—governed by the reasonable-probability test applied in *State v. Christensen*, 929 N.W.2d 646, 679–680 (Iowa 2019). The State does not dispute that framing. So we too focus on whether Mathis has met his burden for a new trial under that test.

To be granted a new trial based on a claim of extraneous influence on the jury—like other juror misconduct—the "(1) evidence must consist only of objective evidence, (2) the acts or statements must exceed tolerable bounds of jury deliberation, and (3) the misconduct must appear calculated to, and with reasonable probability did, influence the verdict." *Christensen*, 929 N.W.2d at 674; *see also id.* at 679. This is a "demanding" test that requires more than merely a "possibility" of prejudice. *Id.* at 679. And we must consider only "objective facts—who said what to whom and when and what specifically was injected into the jury discussion"—"juror assessments about

---

[7] Mathis does not argue that we should apply de novo review. And the State highlights the current "uncertainty" about the proper standard of review. *Compare State v. Liggins*, 978 N.W.2d 406, 417 (Iowa 2022) (applying de novo standard of review to claim of juror misconduct affecting a constitutional right without expressly holding that the standard was required or expressly stating it was not deciding the proper standard), *with State v. Christensen*, 929 N.W.2d 646, 676–78 (Iowa 2019) (discussing arguably conflicting precedents on the issue and declining to resolve the issue where the result of the case did not depend on the standard of review). Because here too it matters not whether we consider Mathis's claim de novo or under an abuse-of-discretion standard of review, we apply the heightened standard of review—considering Mathis's claim de novo without wading into the dispute about the appropriate standard.

the impact of the improper extraneous influence are off limits." *Id.* Still, this is not "a numbers game regarding how many jurors heard what and when they heard it"—a defendant need only show a single juror was "improperly influenced such that a conviction based on a verdict which the juror . . . participated simply cannot be upheld." *Id.*

In *Christensen*, our supreme court applied this test to a claim that the jury was influenced by reported threats on social media that there would be a riot if the defendant was not found guilty of murder. *See id.* at 653–57, 679–80. Polling of the jury after the trial revealed that most of the jurors had heard about the threats—either from another juror or from another source outside the jury room. *See id.* at 654–56. But those who recalled a juror mentioning it varied in their recollection of when that happened—ranging from earlier in the trial to after the verdict was announced. *See id.* They also differed in exactly what was reported, with only one describing it as "threats against the jury," while others generally described it as a "possible riot at the courthouse." *Id.* at 654–55. And at the close of trial, jurors had "requested safety escorts" but that it was "based on their belief that this obviously was an emotionally charged case from what they had seen in the courtroom" and did not mention anything about "social media, or having heard anything out in the community that would have led to them having those safety concerns." *Id.* at 656.

The supreme court affirmed the district court's denial of a new trial, finding that the defendant "failed to show a reasonable probability that the verdict of the jury would have been different if the extraneous influence did not reach the jury." *Id.* at 679. It reasoned that "the threat of a riot reported to the juror and jury was vague" and "there was no objective support for the threat of the riot in the record except the vague hearsay report of a Facebook

13

comment." *Id.* at 679–80. It noted that the evidence showed the threat "was only briefly discussed by the jury," with "no evidence of an extended discussion" and "no persuasive specific evidence that the rumors of a potential riot were discussed at a critical stage in the jury's deliberation." *Id.* at 680. And it concluded that "there was nothing extraordinary about the jury verdict," which "was well within the evidence presented at trial." *Id.* The court acknowledged, but gave little weight to, the jurors' request for a safety escort to their cars—and one juror's request for a patrol of the juror's home—finding that they merely showed "a degree of common sense" "after a controversial trial." *Id.* And so, the court found "[t]here is no objective reason to consider the jury verdict as motivated by fear from a vague speculative hearsay report on Facebook about a possible riot." *Id.*

Mathis's claim of extraneous influence is comparable or less serious than the claim in *Christensen*. Unlike the threat—however vague or speculative—of a riot if the jury found in the defendant's favor there, no message was communicated to the jury at all here. The most that any deliberating juror learned was that a man affiliated with Mathis was walking toward a juror's truck, she thought he was going to say something to her before she drove away, and she was "visibly shaken" by the experience. No words were spoken to threaten or otherwise communicate information about the trial—indeed it is entirely speculative whether the man was even intending to communicate something to the jury.

What's more, the juror who experienced the encounter was designated the alternate and did not participate in deliberations. The court instructed the jury to "not assign blame to either party for delays or for any event occurring outside the courtroom" and to "not let" any information about such an event "influence your decisions." There is no evidence that the jury

engaged in extensive discussions about the encounter—or any at all during its deliberation phase—given that some of the jurors had not heard anything about it. And as the court carefully detailed in rejecting one of Mathis's other grounds for a new trial, the jury verdict was not against the weight of the evidence—so we see "nothing extraordinary about the jury verdict" that could suggest improper influence. *Id.*

Bottom line, there is no objective basis to find "a reasonable probability that the verdict of the jury would have been different if the extraneous influence did not reach the jury." *Id.* at 679. We thus affirm the district court's denial of Mathis's motion for a new trial.[8]

## III. Discretion to Suspend the Special Sentence

Mathis next argues that the district court failed to exercise its discretion—granted by Iowa Code section 901.5(14) since Mathis was a minor when he committed the offenses—whether to suspend his lifetime special sentence under Iowa Code section 903B.1. *See State v. Hess,*

---

[8] Mathis also argues that the court applied the wrong standard for evaluating the extraneous influence—applying "a subjective, actual prejudice standard as opposed to an objective reasonable likelihood standard," thus putting a heightened burden on Mathis that requires a remand for the court to apply the correct standard. But in its oral ruling from the bench, the court said it was applying the test in *Folck*, 325 N.W.2d at 372–73—the same standard applied in *Christensen* that Mathis argues for here. *See Christensen*, 929 N.W.2d at 679 (citing *State v. Cullen*, 357 N.W.2d 24, 27 (Iowa 1984), which in turn relied on and cited *Folck*). And the court's oral reasoning rejecting this ground for a new trial does not show that it put a higher burden on Mathis beyond a reasonable probability of influence. Rather, it explained he couldn't even meet "the barest suspicion that the jury was guilty of misconduct tending to prevent a fair and just consideration of the case." So while "we might tweak some of [the court's] extemporaneous phrasing from the comfort of appellate review," given its full context and our de novo review, Mathis has not shown a remand is required here. *State v. Brammer*, No. 24-0127, 2025 WL 52854, at *5 (Iowa Ct. App. Jan. 9, 2025).

15

983 N.W.2d 279, 282 (Iowa 2022) (holding as a "matter[] of first impression" that a district court has "discretion to suspend the section 903B.1 lifetime special sentence for offenses committed by a juvenile").

We review a district court's sentencing decisions for abuse of discretion. *See State v. Moore*, 936 N.W.2d 436, 439 (Iowa 2019). "A sentencing court's decision to impose a specific sentence that falls within the statutory limits is cloaked with a strong presumption in its favor, and will only be overturned for an abuse of discretion or the consideration of inappropriate matters." *State v. Wilbourn*, 974 N.W.2d 58, 64 (Iowa 2022) (cleaned up). But "[a] district court must exercise its discretion when a sentence is not mandatory." *Moore*, 936 N.W.2d at 439. And so, "when the sentencing court fails to exercise discretion because it was unaware that it had discretion, we typically vacate and remand for resentencing." *State v. Davison*, 973 N.W.2d 276, 289 (Iowa 2022) (cleaned up).

On appeal, it is Mathis's "burden to show the district court was unaware of its discretion to apply a lesser sentence and for that reason failed to exercise its discretion." *Wilbourn*, 974 N.W.2d at 67 (cleaned up). The supreme court has found that a defendant met that burden—showing that a district court was unaware it had discretion to reduce a mandatory minimum prison sentence—when the issue "went unmentioned in the sentencing hearing," the court "did not say or write anything noting its discretion," and the court gave perfunctory agreement to defense counsel's assertion that "we don't have too much wiggle room." *Moore*, 936 N.W.2d at 439–40. So too did a defendant show that the court was unaware of its discretion to suspend a fine when the prosecutor and defense counsel both agreed the court should impose the mandatory minimum amount of the fine, the court mentioned that it "has some discretion in this case to determine what an amount of fine

16

should be," but the court said nothing about having discretion to suspend the fine entirely. *State v. Ayers*, 590 N.W.2d 25, 31–32 (Iowa 1999). And a defendant showed a court was unaware of its discretion to consider a probation sentence—based on a mistaken belief that his offense was a forcible felony so he was ineligible—when defense counsel incorrectly told the court that his offense "is a forcible felony, so that probation would not be an option" and the court mentioned he "was not eligible for *bond* on appeal because he had been convicted of a forcible felony," even though the court also gave a reason expressly weighing against probation in its explanation of the sentence. *Davison*, 973 N.W.2d at 289 (emphasis added).

Still, a district court need not "give its reasons for rejecting particular sentencing options"—it "need only explain its reasons for selecting the sentence imposed." *State v. Russian*, 441 N.W.2d 374, 375 (Iowa 1989). So a defendant did not show that a court failed to exercise its discretion when it never mentioned a statute authorizing a sentence below the mandatory minimum upon a finding of mitigating circumstances but its explanation of reasons supported the consecutive prison sentences actually imposed. *See id*. Neither did a defendant meet his burden when the district court imposed a sentence agreed to in a plea bargain without giving any additional explanation why it declined to further reduce the sentence under a statute authorizing a reduction in the mandatory minimum prison sentence. *See Wilbourn*, 974 N.W.2d at 66–68.

Mathis has met his burden to show that the district court was unaware that it had discretion to suspend his lifetime special sentence. For starters, neither his counsel nor the prosecutor ever alerted the court that it had the power to suspend all or part of the special sentence. To the contrary, his counsel argued that the court needed to grant Mathis a deferred judgment to

give him the chance to avoid the special sentence. He described that as "the big difference for Mr. Mathis and for the Court" between a suspended prison sentence and a deferred judgment. And he explained that the deferred judgment "gives Mr. Mathis the keys to his own future" so that if he "is ultimately successful on a deferred judgment, if he gets that outcome, at the end of the day, he will not have a special sentence," giving him a bigger incentive to succeed on probation compared to merely a suspended prison sentence because he would be facing not only the imposition of the prison sentence but also the imposition of the special sentence if his probation were revoked.

In its thorough and thoughtful explanation of reasons for Mathis's sentence, the district court carefully explained that it had much extra discretion under Iowa Code section 901.5(14). The court told Mathis, "had you been an adult, . . . [y]ou would be sentenced to prison for a term not to exceed 25 years, and there is mandatory minimum associated with that sentence." Yet it explained that "those applicable mandatory sentences if you were an adult are not applicable because the offenses were committed while you were a minor." So the court acknowledged that it could choose to impose three twenty-five-year sentences, could order the mandatory minimums to be served, and could order the sentences to be consecutive. And it noted that this "conviction would come with some collateral issues" and it would "address those later." It also acknowledged that it had the power "to defer judgment" and place Mathis on probation. And it acknowledged "[t]he middle ground, so to speak, is that you would be convicted of the offenses, a sentence would be imposed, but some or all of that sentence would be suspended." But despite this lengthy catalogue of its options, the court did not say it could choose whether to suspend the lifetime special sentence.

18

Indeed, the court did not mention the special sentence at all as it explained (1) how it weighed all the normal sentencing factors and the special factors for juveniles; (2) why it decided not defer judgment; (3) why it imposed two of the sentences consecutively; and (4) why it decided to suspend the prison sentences and place Mathis on probation. Only as it turned to run through other matters—assessing him a $90 domestic-or-sexual-abuse-related-crimes surcharge, informing him of his sex-offender-registration requirement and a $250 civil penalty for that registry, ordering him to complete the sex offender treatment program, and prohibiting him from contact with the victims for five years—did the court finally come to the special sentence. And all the court said was: "Pursuant to 903B.1, you are committed to the Department of Corrections for the remainder of your life, but you are eligible for parole. This is an additional sentence to the underlying three 25-year terms. It commences upon completion of those sentences." Again, there was no sign of any awareness of the authority to suspend the special sentence. Nor was there any explanation of why the court was imposing the special sentence except perhaps to the extent a reason—that it was mandatory—can be implied from the statement it was "[p]ursuant to" the statute normally requiring it.

The court's careful acknowledgment of its discretion to suspend the prison sentence or defer judgment under section 901.5(14), while omitting that the statute also gave it discretion to suspend the special sentence reveals that "the court [was] unaware that the court had the authority to suspend" the special sentence—just like a court that acknowledged it had discretion to set the amount of a fine while omitting its discretion to suspend the fine entirely. *Ayers*, 590 N.W.2d at 31. This finding is buttressed by the mistaken advocacy from defense counsel arguing that the special sentence had to be imposed unless the court deferred judgment. *See id.*; *Davison*, 973 N.W.2d

at 289 (relying on inaccurate arguments by the parties while noting "any fault lies primarily with the parties and not with the district court"). So too does the court's cursory treatment of the special sentence with other items over which it had no discretion—in contrast with its detailed explanations of its other discretionary decisions—support our finding that the court was unaware of its discretion.

The lack of any reasoning for the imposition of the special sentence also distinguishes this case from those involving a court's refusal to suspend a mandatory minimum prison sentence while only explaining its reasons for the prison sentence it imposed. The special sentence here is a distinct part of the sentence—like a fine—not merely an alternative choice for the same prison sentence. So we cannot look to the explanation for the chosen sentence for the showing that the court exercised its discretion. *Cf. Russian*, 441 N.W.2d at 375; *Wilbourn*, 974 N.W.2d at 66–68. Nor is it necessary for the court to expressly state it lacked discretion to make the showing that it was unaware of its discretion since there is *no* explanation. *Compare Ayers*, 590 N.W.2d at 26–29 (finding court was unaware of discretion to suspend mandatory minimum sentence, and distinguishing prior cases that relied on explanation of sentence imposed, based on the court's express statements it lacked discretion), *with id.* at 31–32 (finding court was unaware of discretion to suspend a *fine* without such an express statement).[9]

_____

[9] We recognize that another panel of our court did not follow this distinction in finding that a defendant failed to show a district court was unaware of its discretion to suspend a fine. *See State v. McGraw*, No. 21-0170, 2021 WL 5105901, at *2 (Iowa Ct. App. Nov. 3, 2021). But we are bound by our supreme court's decision in *Ayers*, not that unpublished opinion. *See In re S.O.*, 967 N.W.2d 198, 206 (Iowa Ct. App. 2021); Iowa R. App. P. 6.904(2)(a)(2). And regardless, the facts supporting our contrary finding here are stronger than those in the limited record there. *See McGraw*, 2021 WL 5105901, at *1–2.

Based on this record, Mathis has made an adequate showing that the court was unaware that it had the discretion to suspend the section 903B.1 lifetime special sentence and thus failed to exercise that discretion. And so, we must vacate the special sentence and remand for resentencing on that portion of the sentence so that the district court may consider whether to suspend the lifetime special sentence in whole or part under section 901.5(13). *See Ayers*, 590 N.W.2d at 32.[10]

**CONVICTIONS AFFIRMED, SENTENCE VACATED IN PART, AND CASE REMANDED.**

---

[10] Mathis asks us to vacate only the special sentence. The State makes no argument for a broader vacation order. And the district court has twice now conducted extensive sentencing hearings over more than four years—both times selecting the same suspended prison sentence and placing Mathis on probation for five years. So because the lifetime special sentence is not "a carceral sentence" and we see no reason the court's exercise of discretion whether to suspend all or part of that special sentence would affect the justness or appropriateness of the rest of the already-imposed sentence, we elect to grant only Mathis's requested relief. *State v. Duffield*, 16 N.W.3d 298, 304 (Iowa 2025).